[No. 28609. Department One. June 20, 1942.]

THE STATE OF WASHINGTON, *Respondent,* v. WILLIAM P. McGINTY, *Appellant.*[1]

[1]Reported in 126 P. (2d) 1086.

*John F. Garvin* and *J. E. Bakken,* for appellant.

*B. Gray Warner* and *Leo W. Stewart,* for respondent.

DRIVER, J.—Defendant, William P. McGinty, was charged with violation of Rem. Rev. Stat., § 2440 [P. C. § 9112], subd. (5), by an information in which it was alleged that, on or about August 5, 1941, he "unlawfully and feloniously did live with one Patricia O'Hara, the said Patricia O'Hara then and there being a common prostitute." The jury returned a verdict of guilty. The defendant's motion for a new trial was

denied, and, from the judgment and sentence entered on the verdict, he has taken this appeal.

By his assignments of error, appellant questions the sufficiency of the evidence to sustain the verdict. The material record evidence bearing on that question may be summarized as follows:

On July 28, 1941, at about 8:30 p. m., two officers of the Seattle police department arrested Patricia O'Hara in the Camp Rooms hotel. According to the testimony of these officers and a Seattle police detective, the place then had the reputation of being a house of prostitution. They found her in a large living room, or parlor, just inside the entrance door, dressed in silk pajamas, and they had to wait for her to change her clothing before they could take her to police headquarters. She was at the time away from her place of residence, which was in the Haddon Hall apartments. She had in her possession, in her pocketbook, a record showing that, about two days before, she had been examined by a physician, and that, in the words of one of the officers who made the arrest, "her health had been approved" and was in good condition "so far as any venereal disease was concerned." That, the officer further testified, was "the usual procedure, the girls have one of those."

Appellant was arrested on August 3rd in or near the Seattle police station. The next day, he was questioned by a police detective and signed the following written statement (omitting the heading and the signatures):

"I am living 1923 Third Ave., the Haddon Hall Apts., Apt. 407. I am living at this address with my wife. She is not working now. She was arrested by officer Haley in the Camp Monday night. We were married in Chicago in Nov. of 1939. We were not legally married but she is my common law wife. Her maiden name is Margaret Allen and her home is Denver, Colo.

74

I did not turn this girl out. She was hustling in Chicago before I met her. We have been in town sixty days. We drove out in a car for the Pascal Agency. We are living at this apt. under the name of O'Hara."

The detective testified that, in the argot of the underworld, the expression "I did not turn this girl out" means that he "did not induce the girl to enter a life of prostitution"; that the term "hustling" means practicing prostitution and the terminology is peculiarly characteristic of persons "engaged in the profession of prostitution" and those connected with it as panderers.

The hotel clerk at Haddon Hall testified that, on June 23, 1941, appellant and Patricia O'Hara came to that establishment together, rented apartment 407, and registered under the name of P. O'Hara; that appellant paid two weeks' rent in advance; that he thereafter saw them together in the place from time to time, and that they occupied the apartment continuously for "two months or so."

██ The essential elements of the crime for which appellant was tried are (1) that, on or about the time charged, he lived with Patricia O'Hara; and (2) that she was then a common prostitute. The first element was clearly established. In fact, appellant, when he took the witness stand, freely admitted it. The evidence as to the second element, while wholly circumstantial, aside from any admissions in the written statement quoted above, we think, was sufficient also. The circumstances, as we have summarized them, are not consistent with any reasonable hypothesis of Patricia O'Hara's *innocent* presence in a house of prostitution. Moreover, the jury was warranted in considering such circumstances in connection with the reasonable inferences to be drawn from appellant's statement. It reads: "She is not working *now*. *She was arrested* . . . *in the Camp Monday night*. . . . I did not

turn this girl out. She was hustling in Chicago before I met her." (Italics ours.)

Appellant's counsel contend that the state had the burden of proving criminal intent, and that there is no evidence in the record that appellant knew Patricia O'Hara was a common prostitute while he was living with her in Seattle. Assuming, without deciding, that guilty knowledge is an essential element of the crime charged, evidence to support it was supplied by the following testimony of the police detective who had written out the statement which appellant signed:

"Q. Didn't he [appellant] tell you that if his wife had practiced prostitution that he knew nothing of it until she was arrested? A. No. Q. That he had been out of town, over in Bremerton? A. No; he knew about it. Q. And the first time— A. (interposing) *He admitted that he knew it.* Q. *He admitted he knew it?* A. *He did.*" (Italics ours.)

Appellant assigns as error the admission in evidence of certain articles taken from his room in Haddon Hall by police officers. The officers did not have a search warrant, and appellant maintains that the search violated his constitutional rights. On the other hand, the state's attorneys assert that the search followed appellant's lawful arrest and was permissible as an incident thereof.

It is not necessary for us to go into the question, since the only fruits of the search admitted in evidence were articles (photographs and kodak snapshots of appellant and Patricia O'Hara and other persons) which could not have been prejudicial to appellant. They were all quite conventional and proper, and the only thing they tended to prove was acquaintanceship and prior association between the appellant and Patricia O'Hara. That could not have been harmful to his defense, because both he and his attorney admitted at the trial

that, for some time before her arrest, the appellant had been living with her in the room where the search was made.

Finally, appellant claims error in connection with the examination of his wife as a witness for the state. The deputy prosecuting attorney called her, and appellant's attorney assigned his doing so as misconduct. She was interrogated as follows:

"Q. Your name, please. A. Patricia O'Hara. Q. Are you married to Mr. McGinty here? A. Yes; I am. Q. When did you get married? MR. GARVIN: That is objected to as incompetent."

Then followed a colloquy between the court and counsel, in the course of which the latter approached the bench, and appellant's attorney said:

"I do not know whether Your Honor got the significance of my objection or not. It is this, that under the statute the wife is not permitted to testify against her husband. That is the reason I assigned for the misconduct of counsel, who with knowledge, knowing that she is his wife, called her as a witness."

The trial court reached the conclusion that the state was entitled to question the witness as to the time and place of the marriage, and the following ensued:

"MR. GARVIN: May it be deemed that this goes in under my objection? THE COURT: Yes. Go ahead. Let the record show this discussion was not within the hearing of the jury. Q. (by Mr. Stewart) I believe, Miss O'Hara, you stated you had married Mr. McGinty, the gentleman sitting here at the table? A. Yes. Q. When and where was that marriage? A. It was September 11, 1941. Q. Where was it? A. A Justice of the Peace. Q. In King County; Seattle, King County? A. Yes.

"MR. STEWART: Hearing no objection, I will proceed. MR. GARVIN: This is all going in under objection. THE COURT: All right. MR. STEWART: If there is privilege claimed, the privilege the law gives them, I want it claimed. MR. GARVIN: I have already claimed it.

MR. STEWART: I want it claimed in open court, in the presence of the jury, if it is done. MR. GARVIN: I object to any testimony on the part of—may it be deemed, if the Court please, and Mr. Reporter—may the record show that counsel's statement was made in the presence of the jury. I again assign that as misconduct of counsel. I ask Your Honor at this time to declare a mistrial upon the grounds heretofore urged. THE COURT: The motion for mistrial will be denied. MR. GARVIN: Exception, please. THE COURT: You may have an exception.

"MR. GARVIN: I object to any testimony on the part of this witness, on the ground and for the reason that under the laws of the State of Washington she is incompetent as a witness in this case. MR. STEWART: By reason of the marriage? MR. GARVIN: Now, I object to that further, and I again make the same motion for a mistrial, and assign the statement again of counsel, made in open court, as misconduct. THE COURT: The motion will be denied. MR. GARVIN: Exception, please. THE COURT: You must state the reason. MR. GARVIN: Your Honor knows the reason. Counsel has told you that, and I have told you that. THE COURT: In open court? It has been done in a way here—your opening statement was that she was married, and you made an objection and the objection was sustained, and that is all—on the ground that she is the wife. MR. STEWART: Not competent as a witness because she is the wife of the defendant at the time of this trial now? THE COURT: Yes. MR. GARVIN: May I have an exception to Your Honor's remarks, as well as to those of counsel, as both of them are gratuitous comments upon the evidence. THE COURT: You may have an exception. Go ahead."

On the cross-examination of appellant, he was interrogated as follows:

"Q. Isn't it a fact, Mr. McGinty, that the reason why you married Miss O'Hara in King County was so that she could not testify against you here? A. It is not. MR. GARVIN: That is objected to as incompetent, and I assign this line of cross-examination as misconduct. THE COURT: He said he did not. So it is answered."

The pertinent portion of the applicable statute, Rem. Rev. Stat., § 1214 [P. C. § 7725], subd. 1, provides that

"A husband shall not be examined for or against his wife without the consent of the wife, nor a wife for or against her husband without the consent of the husband; . . ."

This court has held that the statute does not absolutely disqualify one spouse from testifying for or against the other, but, rather, confers a privilege which is personal to the one asserting it. *State v. Frye,* 45 Wash. 645, 89 Pac. 170; *Williamson v. Williamson,* 183 Wash. 71, 48 P. (2d) 588, 185 Wash. 707, 54 P. (2d) 1215. However, the court has definitely frowned upon the practice of calling as a witness the wife of the defendant in a criminal case for the purpose of compelling him to make an objection to her competency. *State v. Winnett,* 48 Wash. 93, 92 Pac. 904.

There, the defendant was charged with carnal knowledge of a certain girl under the age of eighteen years. After the date of the alleged offense and prior to the trial, he married her. A physician testified that she was pregnant, and counsel for the state had her brought into the court room, ostensibly to enable the physician to identify her. The state also called her as a witness. Her pregnancy was far enough advanced to be noticeable from her personal appearance, and the court held that the conduct of the prosecution in bringing her condition to the attention of the jury constituted reversible error. Judge Dunbar, speaking for the court, said, p. 96:

"Again, the appellant's wife was called to testify for the prosecution, and the appellant was compelled to object to her testifying, and while this of itself might not be sufficient to reverse a judgment correctly obtained in other respects, it tends to throw light on the effort of the prosecution in the instance above discussed and to show a fixed determination to bring the

person of the wife to the attention of the jury. The practice of compelling a defendant to urge an objection which would tend to prejudice his case was severely criticized by this court in *State v. Holedger*, 15 Wash. 443, 46 Pac. 652, and *State v. Parker*, 25 Wash. 405, 65 Pac. 776."

In the instant case, after the witness had stated that she was appellant's wife, appellant's attorney objected to further testimony on her part. The court made some comment and did not immediately rule upon the objection. The attorney approached the bench and, out of the hearing of the jury, stated the reason for his objection and invoked the privilege of the statute. The state's attorney did not then question the fact that the witness was appellant's wife. If he had done so, a different situation would have been presented, and the court could have directed the parties to produce evidence as to that matter. *State v. Frye, supra.* The state's attorney took the position that he had the right to elicit from the witness testimony as to the *time and place* of the marriage and to compel appellant to object to the competency of the witness *in the presence of the jury* and on the specific ground that *she was his wife.* The marital status of the parties at the time of the trial was the controlling factor, and appellant was entitled to the protection of the statute even though his marriage did not take place until after the date of his alleged offense. The examination of the wife and the remarks of opposing counsel and the court, together with his own cross-examination above quoted, tended to make it appear to the jury that appellant had married her to prevent her from giving testimony which would have been harmful to his defense. That may well have been the fact; but, even so, it would not have deprived appellant of the privilege conferred by the statute. Under the circumstances, the method pursued in the inter-

80

rogation of the wife was both improper and prejudicial.

The judgment is reversed, and the cause remanded with direction to the superior court to grant appellant's motion for a new trial.

ROBINSON, C. J., MAIN, MILLARD, and SIMPSON, JJ., concur.

