Joseph Gartner SAN FRATELLO,
Appellant,

v.

UNITED STATES of America,
Appellee.

No. 21098.

United States Court of Appeals
Fifth Circuit.
Jan. 20, 1965.

Joseph P. Manners, Miami, Fla., for appellant.

Thomas J. Hanlon, III, Asst. U. S. Atty., Tampa, Fla., for appellee.

Before TUTTLE, Chief Judge, BROWN, Circuit Judge, and BREWSTER, District Judge.

BREWSTER, District Judge:

The prosecution of this case grew out of the nighttime theft from the business establishment of Rasdale Armored Car Service, Inc., in Tampa, Florida, of more than $350,000.00 in money, a substantial part of which had been committed to the custody of the Marine Bank and Trust Company. The deposits of the bank were insured by the Federal De-

posit Insurance Corporation. The first count of the indictment charged that Joseph San Fratello, Jose Alvarez, Hubert Hardin and others whose identities were unknown to the grand jury conspired to enter the building occupied by Rasdale with the intent to steal money in excess of $100.00 committed to the custody of the bank, in violation of Section 2113(b), Title 18, United States Code. The other count, charging only San Fratello, alleged that he aided and abetted Alvarez and others whose identities were unknown to the grand jury in stealing the money.[1] All three defendants were convicted on the conspiracy count, and San Fratello was also convicted on the second count. San Fratello is the appellant here.

The indictment alleged that the conspiracy began on or about November 1, 1960 and continued through January 15, 1961, and that during that time the defendants committed the following overt acts in furtherance of it: (1) San Fratello was instrumental in obtaining employment for Alvarez at Rasdale; (2) Alvarez surreptitiously took numerous photographs of the exterior and the interior of the Rasdale building, including the burglar alarm system and the inside of the vault, with a small, concealed camera; (3) San Fratello took those films to the Tampa Photo Supply for development; (4) Doris Ellick picked up the pictures at Tampa Photo Supply at the direction of San Fratello;[2] (5) Alvarez had unauthorized possession of keys for the front door and the money room of the Rasdale building.

Rasdale operated an armored car service in the Tampa area. Although its office and building were open only during daytime business hours, several of its armored cars picked up money at night from the dog track, supermarkets and other establishments which remained open late. On such occasions, the money was brought to Rasdale's business building and placed in a vault for safekeeping overnight. The burglar alarm service, which was in effect after Rasdale's regular office hours, made it necessary for one of the crew bringing in money after hours to enter the front office door by unlocking it with a key, go through the office to the garage and unlock a door from the inside so that the truck could enter. Entrance to the money room was also gained with a key; and then it was necessary to work the combination on the door of the vault where the money being brought in was to be put. Burglar alarms were located at several places in the building. When a person entered a door after regular office hours, an alarm notified the Tampa Signal Company. An employee so entering for the purpose of bringing in money was required to satisfy the signal company by giving his code identification. Under an arrangement with the Marine Bank and Trust Company, some of the night receipts handled by Rasdale were considered as being on deposit with the bank while they were still in the actual possession of Rasdale.

At the time of the theft, Alvarez was employed by Rasdale as an armored car driver. His car brought in the dog track receipts around midnight on December 26, 1960. During the early morning hours of December 27, 1960, more than $350,000.00 was stolen from the money vault. Shortly prior to the theft, Hardin and Alvarez were in strained financial circumstances; but after it, they began to show signs of affluence. Large sums of money were found in their possession. The bands around some of the packs of currency had the stamp of the Marine Bank and Trust Company on them. Much of the stolen money was

1. The record indicates that Hardin and Alvarez had been previously tried and convicted on the substantive offense in separate cases in the federal court in Tampa. See Hardin v. United States, 5 Cir., 324 F.2d 553 (1963). The present case was tried in Miami on a charge of venue from Tampa.

2. San Fratello married Doris Ellick a month or two after the occasion alleged, and was still married to her at the time of the trial of this case in June. 1963.

never recovered. None of it was found in San Fratello's possession.

The government's theory was that San Fratello, Hardin and Alvarez worked up a thorough plan for the theft and carefully carried it out, with San Fratello as the master mind. It was an essential part of the plan that Alvarez be employed by Rasdale so that entrance could be obtained to its business premises, the money room and the vault.

The only questions presented here which merit discussion arose out of the action of the Court in permitting the prosecution to call San Fratello's wife as a witness so as to require her to claim her privilege against self-incrimination in the presence of the jury, after it had been made known to the Court in the absence of the jury that the witness had claimed her privilege as to the same matters in a previous trial and that she had just advised the prosecutor that she would assert it in this case. The questions are whether it was error to overrule San Fratello's objection to her being required to claim her privilege in the presence of the jury, and if so, whether the error was rendered harmless by the Court's instruction to the jury in connection with the matter.

On the eighth day of the trial, and near the end of the government's evidence in chief, counsel for San Fratello advised the Court in the absence of the jury that he had learned that the government intended to call San Fratello's wife as a witness; that she would refuse to testify to anything other than her name and address on the ground that it might tend to incriminate her; that she had so advised counsel for the government in a conference just a short time before; that she had also refused to testify in another case involving this same matter.[3] Counsel then moved that the government not be permitted to call her as a witness in the presence of the jury on the ground that such action would be prejudicial to San Fratello. The prosecutor admitted to the Court that the witness had told him that she intended "to take the Fifth Amendment," and that "on a previous occasion in another trial, when asked with relation to the same matters, she did on that occasion take the Fifth." He also told the Court that in general he intended to interrogate her about picking up the pictures at the Tampa Photo Supply, which was shortly before her marriage to San Fratello. The indictment alleged that transaction as one of the overt acts in furtherance of the conspiracy. After stating that there seemed "to be no question really of her right to take the Fifth Amendment," the Court overruled the motion on the ground that the privilege was personal to the witness and could be claimed only when the questions were put to her on the stand.[4]

3. The other trial was that of Hardin mentioned in footnote 1.

4. The following quotation of this proceeding is set out to aid in understanding the distinction between this case and the authorities relied upon by the government:

"MR. MANNERS:

"At this time, Your Honor please, if the Court will permit to have the record reflect that the Prosecutor, Mr. Hanlon, and myself have just been in conference with the Court and discussed the Government's next witness to be called, by the name of Doris Ellick—

"MR. HANLON:

"San Fratello.

"MR. MANNERS:

"—San Fratello, who is now the wife of the Defendant, Joseph Gartner San Fratello.

"During the conference, I, as representative of Joseph Gartner San Fratello objected to her being called as a witness in this case because Mrs. San Fratello has been in conference with the United States Attorney, in particular Mr. Tom Hanlon, has told him that she would not testify in this cause as to any questions asked of her, other than her name and address, if she felt that the answers would tend to incriminate her. Mr. Hanlon had called this same witness at another trial previously, and had attempted to ask the same questions of her, and had received as her answer the immunity, the protection of the Fifth Amendment.

"The Court has been advised, Mr. Hanlon has been advised of my position and I strenuously feel, I strenuous-

The jury was then brought into the courtroom and appellant's wife was called as a witness by the prosecution. After she had responded to questions about her name and address, she refused to answer questions about whether she was the wife of the appellant and whether she went to Tampa Photo Supply Company to pick up the film in question, on the ground that her answers to each of such questions might tend to incriminate her. The Court sustained both of her claims of privilege.[5]

At the conclusion of the case the Court gave the following instruction in his main charge to the jury:

"The reluctance of a witness to incriminate herself may not be used

ly object that this would be prejudicial to my client if she is called, because the Government has been alerted that she will not testify for fear of self-incrimination and that the only reason that she would be called now under these circumstances would be to prejudice this jury as to my client's rights and protection under the Constitution of the United States.

"MR. HANLON:

"Would you add that the matters to be inquired into relate to events prior to her marriage.

"MR. MANNERS:

"Oh, yes; in fact, the record can show as a proffer that she will be asked as to whether or not she did pick up certain photographs on or about the middle of January, 1961, from a certain photo shop. And as she has told the United States of America, she feels that an answer to this question would incriminate her and she would not testify to that. Her marriage to my client took place subsequent thereto, by about a month or two, in that proximity.

"MR. HANLON:

"And I, for the benefit of the record, do state that the facts which have just been related by Mr. Manners are true with respect to the fact that she has contacted me and has indicated she intends to take the Fifth Amendment; and that on a previous occasion in another trial, when asked with relation to the same matters, she did on that occasion take the Fifth.

"THE COURT:

"In general these are the matters that are set out in Overt Act No. 6 in the Indictment?

"MR. HANLON:

"Yes, sir.

"THE COURT:

"Which says on or about January 11, 1961, at Tampa, Florida, Doris Ellick picked up photographs from the Tampa Photo Supply at the direction of Joseph Gartner San Fratello. It will be about those transactions?

"MR. HANLON:

"Yes, sir.

"MR. MANNERS:

"Yes, Your Honor.

"THE COURT:

"Is that it?

"MR. MANNERS:

"Yes. And now I will not have to make my objection during her testimony; is that right? With the Court? I mean, it's there?

"THE COURT:

"The record might reflect, I think, that counsel presented this problem to the Court in Chambers and I've advised counsel that, in my view, the Government has a right to call her, even though the Government has been advised, even though Government counsel has been advised that she would take the Fifth Amendment if she were called. There seems to be no question really of her right to take the Fifth Amendment, inasmuch as this would subject her to possible prosecution as an accessory after the fact, as an aider and abettor under Section 2 of Title 18, or as a conspirator under Section 371 of Title 18, or some combination of these three charges. But as I indicated to counsel, I know of no way in which the privilege may be claimed except for the witness to be sworn and the questions put to the witness and the witness claiming the privilege herself. It's a privilege personal to the witness. No matter what she may have told somebody else at any prior trial, no matter what advance notice she may have given the U. S. Attorney, the privilege is personal to her and to the time when the questions are put.

"So the objection of counsel for Mr. San Fratello is, I think, clear in the record and you need not make any further objection in the Jury's presence."

5. "BY MR. HANLON:

"Q Are you the wife of Joseph Gartner San Fratello?

"A I respectfully decline to answer that question on the ground that it might tend to incriminate me.

to incriminate others. In fact, the jury must draw no unfavorable inferences to a defendant because of the fact that a witness has claimed her right under the proper Amendment to the United States Constitution and has refused to testify. In this particular case, Doris Ellick San Fratello's refusal to testify is not to be considered by you as evidence against any defendant in this case, nor may you draw any unfavorable inferences against any defendant in the case from this witness' refusal to testify."

The rule stated by the trial court as the basis for his action is found in 8 Wigmore, Evidence, 3d Ed., #2268, p. 402. The courts have now come to recognize an exception to the rule where the prosecution knows or has good reason to believe in advance that the witness will claim his privilege. In United States v. 5 Cases, etc., 2 Cir., 179 F.2d 519, 523 (1950), the Court said:

"In Wigmore on Evidence, 3d ed. § 2268, the learned author says: 'The privilege is merely an *option of refusal,* not a prohibition of inquiry,' and 'it is universally conceded that the question may be put to the *witness on the stand.*' (Emphasis in original.) Nevertheless we are not prepared to say that it would not be ground for reversal if the party who called a witness connected with a challenged transaction knew, or had reasonable cause to know, before putting the witness on the stand that he would claim his privilege. See McClure v. State, 95 Tex.Cr.R. 53, 251 S.W. 1099; Rice v. State, 121 Tex.Cr.R. 68, 51 S.W.2d 364; cf. People v. Kynette, 15 Cal.2d 731, 104 P.2d 794, 802. * * *"

The quotation that follows is from Rice v. State, 121 Tex.Cr.R. 68, 51 S.W. 2d 364, 365, which in turn quotes from McClure v. State, 95 Tex.Cr.R. 53, 251 S.W. 1099, both of which cases are cited by the Circuit Court with approval in United States v. 5 Cases, etc., supra. The Court said in the Rice case:

"The state called those jointly indicted with appellant to the witness stand, notwithstanding the court had been advised that they would refuse to testify because they were indicted for the same offense. In advising the court of such matter, appellant's counsel requested the court to admonish the district attorney not to place the witnesses on the stand. This request was denied, and, over appellant's objection, the district attorney was permitted to call the witnesses and have them, in the presence of the jury, decline to testify. This matter constitutes error. In McClure v. State, 95 Tex.Cr.R. 53, 251 S.W. 1099, 1102, in discussing a similar question, Judge Lattimore used language as follows: *'If the state's purpose in putting this witness on the stand was to compel or invite his refusal to testify, in order to use this as an incriminating fact against appellant, the state was guilty of an injustice.''* (Emphasis added).

See also United States v. Hiss, 2 Cir., 185 F.2d 822, 832 (1950); United States v. Amadio, 7 Cir., 215 F.2d 605, 613

---

"Q On or about—
"THE COURT:
"The privilege is sustained.
"MR. HANLON:
"Yes, sir.
"BY MR. HANLON:
"Q On or about January the 11th, 1961, did you go to the Tampa Photo Supply Company, in Tampa, Florida, to pick up some film?

"A I respectfully decline to answer that question on the ground that it might tend to incriminate me.
"THE COURT:
"The privilege is again sustained.
"MR. HANLON:
"We have no further questions, Your Honor.
"MR. MANNERS:
"I have no questions, Your Honor.
"THE COURT:
"You are excused."

(1954); United States v. Maloney, 2 Cir., 262 F.2d 535 (1958).

It has been recognized as improper for a prosecutor to require a witness to claim his privilege in the presence of the jury, where, as in this case, the witness has already refused to testify under similar inquiry in another trial, and there is no reason to believe that he has changed his mind about his willingness to testify. In reversing a conviction in such a situation, the Court, in United States v. Tucker, 3 Cir., 267 F.2d 212, 215, said:

> " * * * There is no suggestion that the government had any reason to believe that at the second trial the witness would answer those questions he refused to answer at the first trial. In similar circumstances, two courts of appeals have already warned that a second interrogation, which has no apparent purpose but to invite the invocation of the privilege against self incrimination, is improper and is likely to constitute reversible error. * * * In our view an interrogating official himself gravely abuses the privilege against self incrimination when, believing a truthful answer will incriminate a witness, he nevertheless insists on asking the incriminating question with a view to eliciting a claim of privilege and thereby creating prejudice against the witness or some other party concerned."

■ There is nothing about the government's right to have a witness claim his privilege in response to specific questions while on the stand under oath that requires it to be done in the presence of the jury. As was said in State of Iowa v. Chrismore, 223 Iowa 957, 274 N.W. 3, where the defendant objected to the action of the prosecution in calling as a witness a woman he had married between the dates of the offense and the trial, " * * * If there was any doubt about the truth of this testimony (about the marriage), investigation of the fact could have been made in the absence of the jury, thereby avoiding the effect which would seem inevitably to follow this sort of examination." Professor Wigmore says that, "The layman's natural first suggestion would probably be that the resort to privilege in each instance is a clear confession of crime." 8 Wigmore, Evidence, 3d Ed., #2272, p. 426. See also, United States v. Maloney, 2 Cir., 262 F.2d 535, 537. Even in the face of this inevitable inference, it may well be proper in some cases to have the proceeding in the presence of the jury where the government is dealing with what has sometimes been called the "ordinary" witness; that is, with one not so closely connected with the defendant by the facts of the case, the pleadings, or relationship that the inference of the witness' guilt would likely be imputed to the defendant. The circumstances could be such that the jury would naturally expect the witness to be called. But a defendant's spouse or a co-defendant would not come within that category.[6] Judge Hand, in United States v. Maloney, supra, 262 F.2d at page 537, sets out the protection the government would have against an effort of defense counsel to gain an unfair advantage in

6. Co-defendants: United States v. Tucker, 3 Cir., 267 F.2d 212 (1959); Rice v. State, 121 Tex.Cr.R. 68, 51 S.W.2d 364; Rice v. State, 123 Tex.Cr.R. 326, 59 S.W.2d 119, 121; Washburn v. State, 164 Tex.Cr.R. 448, 299 S.W.2d 706. The special status of a spouse as a witness against the other in a criminal prosecution is almost universally recognized. Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); Wyatt v. United States, 362 U.S. 525, 80 S.Ct. 901, 4 L.Ed.2d 931 (1960); Ford v. United States, 5 Cir., 210 F.2d 313 (1954); Jackson v. United States, 5 Cir., 250 F.2d 897 (1958); State v. Tanner, 54 Wash.2d 535, 341 P.2d 869, 871 (1959); People v. Gill, 143 Cal.App. 2d 46, 299 P.2d 682, 686 (1956); People v. Werner, 225 Mich. 18, 195 N.W. 697 (1923); State v. Chrismore, 223 Iowa 957, 274 N.W. 3 (1937); Caldwell v. State, 162 Tex.Cr.R. 486, 287 S.W.2d 176. The point made to the trial court by government's counsel that the matter to be inquired about occurred prior to the marriage makes no difference. Annotation: 76 A.L.R. 1088.

jury argument from a situation where it is known that the witness will claim the privilege. There was no justification in this case for requiring San Fratello's wife to claim her privilege against self-incrimination in the presence of the jury.

The government argues that San Fratello's conviction should not be reversed even if it was error to call his wife as a witness because: (1) he has not discharged his burden of showing injury from such action; (2) the evidence against him was so overwhelming that there was no injury; and (3) harm was cured by the court's instruction to the jury heretofore quoted. Some of the cases already cited held that similar error was harmless where the same kind of instruction was given and the evidence was such that there could have been no injury. United States v. Hiss, supra; United States v. Amadio, supra. See also United States v. Magin, 7 Cir., 280 F.2d 74 (1960); United States v. Shaffer, 7 Cir., 291 F.2d 689 (1961).

■ The rule is well settled that generally an appellant has the burden of showing both error and injury resulting from it. Baker v. United States, 5 Cir., 156 F.2d 386 (1946); Wells v. United States, 5 Cir., 158 F.2d 932 (1947); Escalante v. United States, 5 Cir., 228 F.2d 61 (1955). That burden is discharged where the record shows error which, "within the range of a reasonable probability, may have affected the verdict." Braswell v. United States, 5 Cir., 200 F.2d 597, 602 (1952); Bacino v. United States, 10 Cir., 316 F.2d 11, 14 (1963). Also, if the error is of such a nature that its natural effect is to prejudice a defendant's substantial rights, it must affirmatively appear from the record to be harmless in order for the conviction to be upheld. McCandless v. United States, 298 U.S. 342, 347, 56 S. Ct. 764, 766, 80 L.Ed. 1205, 1209 (1935);

Kotteakos v. United States, 328 U.S. 750, 760, 66 S.Ct. 1239, 90 L.Ed. 1557, 1564.

■ We are of the opinion that the record shows injury in spite of the Court's instruction. The common law rule is that the *mere fact of calling one spouse* as a witness for the prosecution in a criminal trial of the other for the purpose of forcing the claim of marital privilege against testifying is prejudicial error. It has been generally followed in most jurisdictions where not changed by statute.[7] State v. McGinty, 14 Wash.2d 71, 126 P.2d 1086, expressed the attitude of most of the courts on this matter when it said that, "the court has definitely frowned upon the practice of calling as a witness the wife of the defendant in a criminal case for the purpose of compelling him to make an objection to her competency." The fact that the defendant marries the witness after the commission of the offense and a short time before the trial does not make an exception to the rule, even though it is for the possible purpose of preventing her from testifying. State v. Chrismore, 223 Iowa 957, 274 N.W. 3. While the wife here based her claim of privilege on possible self-incrimination rather than on the marriage, some cases have considered the effect of the two as being about the same. In State v. Tanner, 54 Wash.2d 535, 341 P.2d 869, the Court, in discussing the harmful effect of requiring a spouse to claim the marital privilege granted by its state statute, RCW 5.60.060, had this to say: "In State v. Swan, 25 Wash.2d 319, 171 P.2d 222, we likened the privilege afforded a defendant by RCW 5.60.060 to that privilege afforded him under Art. I, § 9, of the Washington state constitution. As to the latter privilege, it is of course well established that it is prejudicial error in a criminal case for the state to call a defendant and force him to claim the

7. Wharton's Criminal Evidence, Vol. 3 p. 102; State v. McGinty, 14 Wash.2d 71, 126 P.2d 1086; People v. Trine, 164 Mich. 1, 129 N.W. 3, 6; Moore v. State, 45 Tex.Cr.R. 234, 75 S.W. 497, 67 L.R.A. 499; Lynn v. State, 113 Tex.Cr.R. 637, 21 S.W.2d 1042; Davis v. State, 160 Tex. Cr.R. 138, 268 S.W.2d 152; Hignett v. State, 168 Tex.Cr.R. 380, 328 S.W.2d 300. Also cases involving following named defendants cited in footnote 6: Tanner, Chrismore, Caldwell, Werner, Gill.

privilege against self-incrimination. * * * " If there is any difference, the claim against self-incrimination is more prejudicial, because the jury might possibly conclude that a spouse claiming only the marital privilege did not want to be cast in the role of a witness for the prosecution, even though he or she had no connection with or knowledge of the crime. We are of the opinion that the prosecution would have a heavy burden of showing affirmatively that there was no injury where a defendant's spouse is called under circumstances such as those existing in this case. As was said in People v. Trine, 164 Mich. 1, 129 N.W. 3, 6, about the prejudice resulting from requiring the claim of the marital privilege in the presence of the jury, "Such errors by the prosecuting officer are not easily cured." The prosecution could have had no purpose in calling this witness and requiring her to claim her privilege in the presence of the jury other than to use her conduct as an incriminating circumstance against her husband; and it is more than reasonably probable that its conduct in so doing prejudiced him.

While we do not regard it to be necessary to go into the facts appearing in the voluminous record of this case to evidence prejudice to San Fratello, the seriousness of the offense and the expense of the trial justify our calling attention to a few matters to show the extent of the injury to him in spite of the Court's instruction. It is true that the prosecution stated to the Court that the primary fact that it desired to prove by her was that San Fratello requested her to go and get the pictures in question at the Tampa Photo Supply and bring them to him, and that San Fratello later testified that she did so. However, his explanation about the pictures did not implicate him criminally in this transaction, while she put the stamp of criminality on it by claiming her privilege. In addition, the jury had no way of knowing that the prosecution thought, if they did, that all she knew about the transaction was getting the pictures at the

photo shop and delivering them to San Fratello. She even claimed that it would tend to incriminate her to answer the prosecutor's question as to whether she was married to San Fratello. Any number of irreparably harmful inferences could have been drawn from that action by her. With a large amount of the stolen money still missing, the jury could have taken it to mean that at one time she and San Fratello had some of it in their possession. While there was no question about the fact that the offense was committed, and the proof showing Hardin's and Alvarez' connection with it was most convincing, the government had no overwhelming case against San Fratello. Three grand juries heard this matter before San Fratello was indicted. Such was not the case with Hardin and Alvarez. They were indicted on the substantive offense by grand juries which did not bill San Fratello. The case against him depended on circumstantial evidence. Some of the witnesses offered to prove the circumstances most prejudicial to him had criminal records, and there was testimony showing that they had made prior statements contradictory of those given by them on the trial. San Fratello took the witness stand and denied any participation in the conspiracy or the theft. He strenuously contested his guilt all the way. Some of the strongest circumstances offered by the prosecution against him were that his wife stated in the presence of the jury that it might tend to incriminate her to admit she was married to him, and that she put the stamp of criminality on some of San Fratello's conduct. The jury could not have inferred that she was guilty without concluding that it was through participation with her husband in the transaction. Under the circumstances, we are of the opinion that the facts in the case show that prejudicial error was committed under the following test laid down in Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566:

"If, when all is said and done, the conviction is sure that the error

did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. Bruno v. United States, supra [308 U.S. 287, at 294, 60 S.Ct. 198, at 200, 84 L. Ed. 257, at 260]. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

The judgment is reversed and the case is remanded.