**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Herbert Lee PITTS, Defendant-Appellant.**

**No. 28729**

**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

June 18, 1970.

---

1. See 26 U.S.C. § 911.

2. See Treas.Reg. § 31.3401(a) (8) (A)–1.

---

Herman B. Franco, Montgomery, Ala., court-appointed, for appellant.

Ira De Ment, U. S. Atty., D. Broward Segrest, Asst. U. S. Atty., Montgomery, Ala., for appellee.

Before JOHN R. BROWN, Chief Judge, MORGAN and INGRAHAM, Circuit Judges.

JOHN R. BROWN, Chief Judge:

■ Defendant was convicted on a charge of bank robbery which occurred in December, 1968 in Tuskegee, Alabama. Before the Court, sitting without a jury, he made no effort to deny the commission of the alleged act. Rather the whole defense was premised on his mental incompetence when the crime occurred, an issue which Defendant raised with his plea of not guilty. At the close of all the evidence, the Trial Court concluded that the Government had met its burden of proving sanity beyond a reasonable doubt, a burden which arises after Defendant presents evidence of the contrary inference. Brock v. U. S., 5 Cir., 1967, 387 F.2d 254, 257. Believing that the evidence was sufficient to support such a finding, we affirm.[1]

■ We must first dispose of the threshold issue that the sufficiency question is not properly before us. At the end of the Government's case, Defendant made a motion under F.R. Crim.P. 29 for acquittal, yet he did not renew the motion at the close of all the evidence. In a jury case, we have held that this failure to renew waives the initial motion, and that the appellate court cannot thereafter review the sufficiency question except to prevent a "manifest miscarriage of justice" or "plain error". See e. g., Hall v. U. S., 5 Cir., 1968, 403 F.2d 649; Clark v. U. S., 5 Cir., 1961, 293 F.2d 445; Fallen v. U. S., 5 Cir., 1955, 220 F.2d 946. However, we have also held that this waiver doctrine does not apply to a non-jury case. In that instance a not guilty plea suffices as a motion for acquittal. Hall v. U. S., 5 Cir., 1961, 286 F.2d 676. Thus we need not consider the recent attacks that have been made on the waiver rule in jury cases.[2]

---

1. Pursuant to Rule 18 of the Rules of this Court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 5 Cir., 1969, 409 F.2d 804, Part. I; and Huth v. Southern Pacific Co., 5 Cir., 1969, 417 F.2d 526, Part I.

2. For the view that the waiver rule jeopardizes the defendant's right to a jury trial, see Cephus v. U. S., D.C.Cir.1963, 117 U.S.App.D.C. 15, 324 F.2d 893; Comment, The Motion for Acquittal: A Neglected Safeguard, 1961, 70 Yale L.J. 1151. For the view that the jury—nonjury dichotomy on waiver is unjustifiably inconsistent, see 2 C. Wright, Federal Practice & Procedure, 1969, § 469 at 266.

■■■ The evidence in the case centered around expert witnesses on the insanity issue.[3] The two witnesses for the defense were the only doctors who had any direct knowledge of Defendant's mental health. But the Court as fact finder need not be bound by expert testimony even if all of the witnesses are presented by only one side. That evidence

" * * * may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, 'the reasoning by which he progresses from his material to his conclusion,' * * * inconsistencies or contradictions in his testimony as to material matters, material variations between the experts themselves, * * *. In some cases, the cross examination of the expert may be such as to justify the trier of fact in not being convinced by him. One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony; "

Mims v. U. S., 5 Cir., 1967, 375 F.2d 135, 143–144. All of these factors were present here to support a finding that the Government had shown mental competence beyond a reasonable doubt.

The first witness was Dr. Cooper Price, Chief Psychologist of the Federal Prison in Tallahassee. It was here that the Defendant was sent twice in 1969 for a Court-ordered psychiatric examination. The doctor told of Pitts' bizarre childhood, of his stays in mental hospitals, and of his family history of mental instability. Dr. Price characterized Pitts as a paranoid schizophrenic who had periods of exacerbation and remission. Dr. Price was then asked for his opinion of whether Defendant could have resisted the commission of the wrongdoing and could have conformed his conduct to legal requirements.[4] The doctor replied that he had formed no opinion.

The second defense witness was Dr. Earl Parsons, the physician most directly in charge of the examination of Pitts in the Federal Prison. Dr. Parsons agreed with the diagnosis of Dr. Price and said that Pitts' paranoic tendencies displayed themselves most clearly in his delusion that he would be the savior of his race. Dr. Parsons stated his opinion that Pitts was psychotic on the day of the crime and that he could not resist what he was doing.[5]

---

3. The Government also produced several lay witnesses who described their reactions to Defendant's conduct. However since the findings of the Trial Court can be justified entirely without reference to this testimony, we need not pause to explore the unending ramifications of lay versus expert testimony.

4. The legal definition of insanity was set forth in Blake v. U. S., 5 Cir., 1969, 407 F.2d 908, 916:
"In sum, we adopt the following standard as a definition for use in defining insanity in this circuit where the defense of insanity is in issue:
'(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

'(2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct'."
Here the question directed the doctor's attention to the volitional half of the *Blake* test.

5. In his second examination of Pitts, Dr. Parsons was something less than unequivocal in his opinion:
"My overall view in study of this man indicates that his Mental condition at the time of the crime was such that he was incapable of acting with prudence and good judgment. While he knew his conduct was considered wrong by society in general he was so engrossed with his own inner feelings which had been stimulated by the medication (possibly), that he probably could not resist playing the role he was acting."

Dr. Parsons believed that certain drugs, PAS and INH, that had been formerly prescribed for Pitts' tubercular condition may have produced toxic psychosis, that is, these drugs brought forth the Defendant's underlying schizophrenia.[6] Yet the doctor could not say for certain that Pitts had taken these pills near the date of the robbery nor could he say for sure that the pills had triggered the reaction. Furthermore the doctor had never administered the drugs in question. Finally the doctor believed that one in the remission stage would not be deemed insane; however, the doctor conceded that he did not know what phase the Defendant was in on the day of the crime.

The Government did not put on expert testimony that directly contradicted the assertion that Pitts was insane. Instead it presented Dr. Leon Rosen who had never examined Pitts but who had wide experience in the treatment of tubercular patients. Dr. Rosen said he had given the drugs in question over seven hundred times and had never observed one instance of adverse mental reaction in his patients. Dr. Rosen admitted that the drug label says toxic psychosis may result but pointed out that labeling requirements insist that such notice be given any time the incidence of the effect exceeds one in a million cases.

■ *Mims, supra,* gave certain techniques by which the Government could meet its burden on the mental competence issue by discrediting the experts of the Defendant. *Mims* has been satisfied here. Dr. Parsons based his opinions to a degree on the Defendant's drug usage but he did not know if Defendant in fact had taken the drugs or if the drugs would cause mental aberrations. He could not say what mental stage existed at the occurrence of the act. Dr. Parsons gave a medical opinion, but Dr. Price would not. Certainly all of this discredited the expert testimony enough so that reasonable minds could differ on the issue of competence.[7] As the fact finder, the Court below could therefore select among the conflicting inferences. The conviction must be affirmed.

Affirmed.

---

6. Technically toxic psychosis refers to a psychotic effect produced by drugs in a formerly normal person.

7. Although in our discursive analysis we did not refer to the lay testimony, see note 3, *supra,* it adds considerable weight to this legal conclusion. The brief of the Government gives an acceptable summary:

"[t]estimony from the police officer, Chief Eugene Harrison, who arrested the defendant within fifteen minutes after the robbery took place, and Mr. Chilton Creason, Special Agent, Federal Bureau of Investigation, who questioned the defendant some five or six hours after the commission of the robbery was to the effect that the defendant was calm, responsive to questions, did not exhibit any undue nervousness, was rational, composed, not hostile or belligerent in any way, and appeared to be normal. The testimony of Special Agent of the Federal Bureau of Investigation, Chilton Creason, brought out

428 F.2d—34½

that the defendant on the date of the crime gave him a lengthy statement, in which he denied the crime, but that on December 20, two days later when the defendant was reinterviewed he admitted the offense. On each of these occasions the defendant's statements contained minute details of events, places, times. The government contends that his denial of the offense on the 18th shows that he knew the wrongfulness of his conduct.

\* \* . \* \* \*

The United States brought a number of witnesses who had had an opportunity to observe the defendant as a student at Tuskegee Institute during the months from September through December up to the date of the commission of the crime. This testimony summarized showed that the defendant during this period of time did not manifest any abnormal behavior, that his attendance in class was regular, that his work was satisfactory."

Government's brief at pp. 4–5, 7.