UNITED STATES of America,
Plaintiff-Appellee,

v.

Jorge Manuel PARIENTE,
Defendant-Appellant.

No. 76–4212.

United States Court of Appeals,
Fifth Circuit.

Sept. 8, 1977.

Roland E. Dahlin, II, Federal Public Defender, Houston, Tex., Juan E. Gavito, Charles S. Szekely, Jr., Asst. Federal Public Defenders, Brownsville, Tex., for defendant-appellant.

Edward B. McDonough, Jr., U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr., John P. Smith, James R. Gough, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

Jorge Manuel Pariente was convicted by a jury on fifteen counts of transporting aliens in violation of 8 U.S.C. § 1324(a)(2). A codefendant, Julio Coronado, pleaded guilty and was thereafter called by the prosecution to testify at the trial of appellant Pariente.

 Pariente's contentions on appeal, *inter alia*,[1] are that government counsel committed reversible error (1) in commenting on his failure to call his wife as a witness, which error was compounded by the trial court's instruction to the jury that the comment was a valid argument which they could consider, and (2) in making reference before the jury to an alleged sworn statement not in evidence which incriminated defendant and impeached his testimony. We agree and therefore reverse the conviction and remand the case for a new trial.

Evidence produced by government witnesses showed that Julio Coronado, after having previously arranged in Matamoros, Mexico, to transport aliens to Naples, Florida, for a fee, picked up seventeen of them in a rented U–Haul van on September 5, 1976, on the outskirts of Brownsville, Texas. Coronado then entered the freeway and exited at Brownsville to buy cigarettes and jugs of water from a Jif-E-Mart convenience store. There he met appellant Pariente, a casual acquaintance, and told him he was driving to Florida or up north. Pariente responded that he was interested in going to San Antonio, whereupon Coronado offered him a ride and payment for his

---

1. Appellant also contends on this appeal that the evidence was insufficient to support his conviction. The record shows that at the close of the Government's case the defense moved for a judgment of acquittal based on insufficiency of the evidence and the motion was overruled. However, the defense did not renew the motion at the close of all of the evidence. This failure to renew thereby waived the initial motion and the sufficiency question cannot be reviewed except to prevent a manifest miscarriage of justice or for plain error. *United States v. Pitts*, 5 Cir., 1970, 428 F.2d 534. Nevertheless, our own evaluation of the facts and circumstances of the case convinces us that there was sufficient evidence to send the case to the jury and that the issue of manifest miscarriage of justice or plain error is not involved. Though the case depended in large measure upon circumstantial evidence, that evidence must be considered like direct evidence since the test for judging sufficiency is the same as to both. *United States v. Barrera*, 5 Cir., 1977, 547 F.2d 1250. The evidence was also subject to credibility determinations, which in this case was properly for the jury's resolution.
We, therefore, find no merit in the contention of the appellant that the evidence was insufficient to sustain his conviction.

assistance in driving. Coronado, however, did not think Pariente heard his offer of money as Pariente was not paying much attention, and no amount was agreed upon. Coronado opened the rear of the van and gave the water to the aliens, after which Pariente and Coronado got into the van and proceeded north. South of the Falfurrias checkpoint Coronado stopped the van to let the aliens out. Pariente inquired about the presence of the aliens and was told by Coronado that they lived around there and further that it was his, Coronado's, business.

Near midnight of the same day, Border Patrol agents received information that several persons who appeared to be aliens had been seen leaving a U–Haul van just south of the Falfurrias checkpoint. Acting on this tip, one of the agents stopped the van at the checkpoint. The only occupants of the vehicle were Coronado, the driver, and defendant Pariente, a passenger. The rear of the vehicle was empty except for a deodorant spray can. After answering questions concerning their United States citizenship, Pariente told the agent that they were headed for San Antonio to pick up automobile parts. Coronado and Pariente then checked into Lacy's Motel at Falfurrias, where the same van was observed and put under surveillance. In the meantime, Border Patrol agents had detected signs of human presence and sounds south of the checkpoint in a secluded area. About 6 a. m. the following morning Pariente and Coronado entered the van which then departed in the direction of the suspected area. The vehicle, with Coronado and Pariente in the driver's seat and passenger's seat, respectively, was soon thereafter stopped and searched. Seventeen aliens were discovered in its rear portion. Coronado and Pariente were arrested and the van containing the aliens was driven to the Falfurrias office by Border Patrol Agent Jackson. Jackson noticed while driving that the heavily-loaded van was sluggish as it swayed back and forth and that there was also a strong perceptible body odor emanating from the rear of the vehicle.

On cross-examination by defense counsel, the arresting agent testified that Coronado had told him that "Pariente didn't know the aliens were in the van until they stopped to let them out." Coronado's direct examination was to the same effect and he repeatedly denied that Pariente was involved in the illegal transaction or that he, Coronado, had intended to cut Pariente in on the money. Coronado expected to pay him for driving but lacked the chance to convince Pariente to drive prior to the arrest. There was no evidence that Pariente was paid by Coronado or that he had driven the vehicle.

Defense witnesses, four of the transported aliens, testified that all of their negotiations for crossing the border were with Coronado and they were unaware of Pariente up until the time of his arrest.

Pariente testified on his own behalf that he was a migrant laborer, living with his wife in Brownsville, Texas. While he and she were driving around looking for job opportunities at construction sites at Brownsville they stopped at the Jif-E-Mart to purchase cigarettes where they saw Coronado. After accepting the ride, Pariente told his wife that he would return in a few days. He was unaware of the aliens in the van until they were unloaded by Coronado. He next encountered the aliens when Coronado returned for them on the following morning. He testified that when he was aware of what was happening he thought of telling Coronado to stop and let him off somewhere but their imminent arrest foreclosed that decision.

Pariente denied having been promised payment in return for assisting Coronado to drive. On cross-examination of defendant by the prosecution the following occurred:

Q. At any rate Julio testified that when he saw you at this Jif-E-Mart there in Boca Chica that he told you he was going to pay you for helping him drive?

A. He never told me anything about that, and we didn't even talk about that.

Q. Well, now he also said that he didn't tell you how much he was going to

pay you but he did say he was going to pay you.

A. Maybe he thought he was telling me that, but he never told me.

Q. *And we even have here a sworn statement.*

A. He never told me.

The interpreter: I didn't get your question.

Q. *And we even have a sworn statement here by Julio in which he says the same thing.*

Mr. Gavito [defense counsel]: Now we are going to make an objection to that as hearsay and also violation of the Sixth Amendment.

The Court: *You never asked Julio if that was in the statement.*[2] (Emphasis supplied.)

■ Appellant contends, and we agree, that the prosecutor's reference to Coronado's alleged sworn statement had the improper effect of placing before the jury for its consideration extrinsic matter asserted as fact though not in evidence; that the jury could have concluded that the sworn statement was not available to them due to some legal technicality; and that the effect of the prosecutor's remark was to impugn the credibility of Pariente tending to show his guilt. *See Hall v. United States,* 5 Cir., 1969, 419 F.2d 582, 583. In speaking of prosecutorial misconduct, the Supreme Court said in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), assertions of personal knowledge by the prosecutor "are apt to carry much weight against the accused when they should properly carry none." The prosecuting attorney's reference to Coronado's statement which had not been introduced in evidence lacked both propriety and fairness.

■ In his final argument the prosecuting attorney made the following comments:

Ladies and gentlemen, this entire defense put on by the Defendant is hiked up, is false, is conjured. There is one person who could have set this whole matter clear for us, and who was that? The *wife.* (Emphasis added.)

The trial court sustained an objection by defense counsel and instructed the jury to pay no attention to the comment of counsel but reversed his ruling after a bench conference urged by the prosecution and instructed the jury as follows:

I told you all not to pay any attention to counsel about the wife not being here, and I instructed you not to pay attention to that. I instruct you that that is a valid argument and that you can consider. All right.

The prosecuting attorney then continued:

The Defendant has no burden to produce any evidence but he took the burden to go on, and I think bring some evidence forward to you. *There is one person that was available to him that he could have brought who could have cleared this whole matter up and why they were there. And who is that one person? The wife. Yet, where is the wife?* (Emphasis added.)

■ The common law rule[3] permitting spouses to refrain from testifying against each other without the consent of both has been recognized by this Court as a distinct privilege arising out of the marital relationship. *See United States v. Harper,* 5 Cir., 1971, 450 F.2d 1032; *San Fratello v. United States,* 5 Cir., 1965, 340 F.2d 560; *United States v. Seay,* 5 Cir., 1970, 432 F.2d 395.

2. The trial court's observation was correct. The only reference appearing in the record to Coronado's statement was on direct examination by the prosecutor when he asked:

Q. Okay. Mr. Coronado, I want you to tell us as best as you remember how it was that you got involved with transporting these seventeen aliens. You have already given a statement to our officers. Is that correct?

A. That's correct.

3. The rule was codified in Rule 26 of the Federal Rules of Criminal Procedure (1940): "The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." *See also* Federal Rules of Evidence, 28 U.S.C. § 501, to the same effect.

While the continued validity of the privilege remains,[4] the dilution of that privilege is not under all circumstances reversible error. For instance, in *United States v. Seay, supra,* 432 F.2d at 404, we held that a comment by the prosecution on the failure of defendant's spouse to testify, accompanied by an instruction to the jury that the remark is not to be considered as evidence, is not error where the evidence of guilt is substantial and the fairness of the trial is not affected thereby. On the other hand, in *San Fratello v. United States, supra,* we found reversible error in the action of a prosecutor in calling a defendant's spouse to the stand, thereby forcing her to exercise her privilege against self-incrimination, which the court said under the circumstances amounted to the exercise of the marital privilege, notwithstanding an instruction by the court to draw no unfavorable inferences from the privilege claimed, where the record showed that defendant's right to a fair trial was prejudiced:

> If the error is of such a nature that its natural effect is to prejudice a defendant's substantial rights, it must affirmatively appear from the record to be harmless in order for the conviction to be upheld.

340 F.2d at 566.

■ Thus, in order to determine whether or not a conviction should be upheld where the marital privilege is relevant it is necessary to balance the action of the prosecutor against the weight of the evidence. In the present case the evidence of guilt was circumstantial. The Government contended that Pariente was an active, willing and knowing participant in a joint venture to illegally transport aliens. Appellant's response is that he was a mere passenger and that his meeting with Coronado was happenstance. There was no proof that Pariente agreed to accept payment from Coronado. The prosecutor's gratuitous remark while cross-examining Pariente that he, the prosecutor, had a sworn statement from Coronado contradicting Pariente's testimony, coupled with the comment in final argument relative to the absence of Pariente's wife and condoned by the trial court in its instruction, tipped the scales unfairly and prejudicially against Pariente. The totality of these errors had the cumulative effect of denying appellant his right to a fair trial. We cannot say on this record that the errors claimed were harmless.[5]

REVERSED AND REMANDED.

---

**4.** Although the privilege has been criticized (*see generally* 8 Wigmore, Evidence § 2228) and characterized as a "sentimental relic" (2 Wright, Federal Practice and Procedure, 1969, Criminal, § 405, p. 84) and an "archaic survival of a mystical religious dogma" (McCormick, Evidence, 1954, § 6, p. 145), it has withstood these attacks and remains firmly established in federal court. (Wright, *supra,* p. 85; McCormick, *supra,* p. 145.) While it is axiomatic that any privilege, by its nature, may be exercised or waived, defendant in the present case was not afforded that choice. Professor Wright suggests that "The defendant should be given opportunity to claim the benefits of the rule in the absence of the jury, and no adverse inference can be drawn or comment permitted on his refusal to waive the rule," citing *Graves v. United States,* 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893); *San Fratello v. United States,* 5 Cir., 1965, 340 F.2d 560; *Courtney v. United States,* 9 Cir., 1968, 390 F.2d 521; *Tallo v. United States,* 1 Cir., 1965, 344 F.2d 467. Wright, Federal Practice and Procedure, 1969, Criminal, § 405, p. 88.

**5.** We have noted the comments in the special concurring opinion which relate to our holding that the prosecutor improperly impugned the credibility of Pariente on cross-examination when he stated that he had "a sworn statement" from Coronado "in which he says the same thing," that is, that Coronado was going to pay Pariente for helping him drive the truck with the aliens aboard.

We have carefully examined the record and find that there is no such "sworn statement" of Coronado or any similar exhibit filed herein. We hold to our view that the prosecutor was guilty of improper cross-examination of defendant Pariente in referring to a sworn statement which was never offered in evidence. Coronado repeatedly stated in his testimony that the defendant, Pariente, was not involved in the transaction; that he was planning to pay him to help in driving if he could convince him but that he never had the chance to do so before they were arrested. (R. 120.)

The prosecutor did not use Coronado's so-called sworn statement to impeach his testimony, but waited until Pariente testified and then orally stated to the court and jury that he had such a sworn statement of Coronado in his possession that Pariente was to be paid. Thus

THORNBERRY, Circuit Judge, concurring specially:

While I agree with the majority that defendant was denied a fair trial and therefore concur in reversal of the conviction, my reasons differ somewhat from the reasons put forth in the majority's opinion. Accordingly, I write separately.

I agree that the prosecutor violated the defendant's marital privilege in his comment on the defense's failure to call Mrs. Pariente as a witness. As the Ninth Circuit stated in *Bisno v. United States*, 299 F.2d 711, 723 (9 Cir. 1961), *cert. denied*, 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962):

> [T]he established principle which permits an inference that the excluded testimony would be unfavorable to the party who suppressed it ought to yield, as being inconsistent with the full exercise of the [marital] privilege.

I must disagree, however, with the majority's holding that the prosecutor erred in mentioning Coronado's sworn statement during cross-examination of defendant Pariente. The controlling precedent, *Hall v. United States*, 419 F.2d 582 (5 Cir. 1969), sets forth a battery of questions relevant to the determination of error in such situations:

> Are the prosecutor's statements made for the purpose, or do they have the effect, of getting before the jury for its consideration extrinsic evidentiary matter? Does the extrinsic matter consist of statements by the prosecutor of matters asserted as fact though not in evidence? Or does the extrinsic matter consist of statements which reasonably lead the jury to believe that there is existent evidence not available to them but the content of which is unrevealed?
>
> Does the extrinsic matter, whether its content is delineated or its existence merely implied, tend to show the accused guilty of the offense charged? Or does it tend to persuade that he is guilty of some other offense than that charged? Or that he simply should be put away as a social undesirable? Does it go only to his credibility? Is the subject-matter of the remarks just abstract name-calling, not really related to evidence at all?

419 F.2d at 583.

The majority notes that Coronado testified as to the existence of the statement. But it overlooks pages 95–98 of the transcript, which contain direct testimony as to the contents of that statement, including the offer of payment.[1] The majority also notes that we do not have in our files the written statement itself. Nevertheless, the prosecutor referred to a statement by Coronado mentioning an offer of payment, and the testimony quoted in the margin deals

the prosecutor acted as a prosecuting witness as well in getting before the jury extrinsic evidentiary matter which was asserted as a fact though not in evidence. The effect of the prosecutor's voluntary statement was seriously to impugn Pariente's credibility and thus to show that he was guilty of the offense charged. The prosecutor's conduct thus violated the principles in *Hall v. United States*, 5 Cir., 1969, 419 F.2d 582, 583, and the areas of inquiry set forth in that decision. The trial judge pointed out at the time in a remark to the prosecuting attorney, "You never asked Julio (Coronado) if that was in the statement." Indeed the prosecutor had not. Nevertheless he attempted to impeach defendant Pariente with an apparent written statement of Coronado, not in evidence, on the critical issue of payment to Pariente. Such examination was patently prejudicial. We do not know from the record or otherwise what the "sworn statement" which the prosecutor said he held and never introduced into evidence would reveal. It is not before us.

1. The relevant portion of the transcript reads:

Q You said you had occasion to give the Miranda warnings to the co-defendant in this case, Mr. Coronado. Did you question Mr. Coronado?

A I questioned him after he agreed to answer questions without a lawyer present, after I gave him his warnings, yes sir.

Q What did he tell you?

Mr. Lewis: Your Honor, we are going to object to that on the grounds of hearsay, particularly since Mr. Coronado is available to all parties in this proceeding.

The Court: He can tell us what he told him.

Overruled.

Go ahead, what did Mr. Coronado tell you?

A Well, he gave me a statement to the fact that Thursday he was in Matamoros and he met two men there in the plaza and they asked to be taken to Naples, Florida, for a hundred dollars apiece. He said in total it was thirty-two men that wanted to go. And Mr. Coronado said he agreed to take them. And so the man that was talking to him told him that they would meet him or call him whenever they were going to come across and tell him.

with a statement by Coronado mentioning an offer of payment. The jury heard testimony as to the existence and contents of a statement fitting the description of the contents of the one which the prosecutor mentioned. The majority's decision to ignore the testimony because we do not have physical custody of the documentary form of the statement seems to me, on these facts, to be hollow formalism. It seems to me that common sense allows us to consider clear, direct testimony. To be sure, this testimony entered the record over defendant's objection but defendant apparently has abandoned that objection on appeal. The evidence therefore suffers under no probative disability, and should be as available as any other properly introduced evidence to provide ammunition for cross-examination. The only "extrinsic" aspect about the statement was that the sheets of paper themselves did not find their way into the exhibit envelope. *Hall* simply fails to support a finding of error here.

And so Saturday, I believe it was Saturday he got a call about 3:00 o'clock in the afternoon. He told him to meet the people at La Esperanza Road.

Q Was it one man acting as spokesman for all aliens?

A Yes sir, that's what he said.

Q Go ahead.

A And so he got the call to meet them at there about 3:00 o'clock Sunday afternoon which was the 5th. . . .

A This is about 3:00 o'clock Sunday afternoon, and he went over there and he said he walked from his house out there and he talked to the people out there and there he collected a sum of $830, I believe, from them. Then and went and rented a U-Haul van, went back after dark, picked them up, started down the freeway and got off the freeway near Boca Chica where he was going to buy some cigarettes at a Jif-E-Mart, I believe he said, and he went to buy some cigarettes and as he was leaving he said he saw Mr. Pariente walking down the street, and they said he had seen him around before, so he stopped and asked Mr. Pariente to help him drive to Florida. He said he would be paid something for his trouble.

And Mr. Pariente agreed and got in the pickup and they came on——in the van.

Q Did Mr. Coronado tell you that he had informed this defendant about the transportation of the aliens?

A No sir, he didn't tell me that.

Q Didn't he in fact tell you, officer Jackson, that when he picked up Mr. Pariente that Pariente was not aware that the aliens were in the van?

Mr. Lewis: Your Honor, we are going to object to that. First place what Mr. Pariente, the defendant, would be aware of would be beyond the competency of Coronado to testify to.

Second place, this is all hearsay. Mr. Coronado is upstairs and he knows what he said and we can bring him down here, ask him.

The Court: Overruled. What did Mr. Coronado tell you?

A He said that Mr. Pariente didn't know the aliens were in the van until they stopped to let them out.

Q And that's when they let them out according to your conversation with Mr. Coronado, that's when they let them out just south of the checkpoint so they could walk around the checkpoint through the brush?

A That's right, that's what he said.

Q He told you that that was the first indication that Pariente was aware that there was anybody in the van?

A That's what Mr. Coronado said.

Q Yes, and at the time that he gave you this statement he did not have benefit of anyone advising him such as a lawyer or another person?

A Well, he signed the release saying that he didn't want a lawyer present at the time, sir.