**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 92-7306**
_____


**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**


**VERSUS**


**JOSEPH T. COVENEY and
FRANCIS M. COVENEY,**

**Defendants-Appellants.**

_____

**Appeals from the United States District Court
for the Southern District of Texas**

_____

(July 6, 1993)

Before POLITZ, Chief Judge, REAVLEY, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

This tax fraud appeal turns on a fairly routine, straight-forward and simple issue, sufficiency of the evidence; but, it is complicated greatly by the Government's failure to carry the day on its global theory for conviction, by the concomitant difficulty of instead reviewing its proof on a count-by-count basis, and by the incomplete state of the record on appeal, due to the Government's failure to include the exhibits. Also in issue is the possible prejudice suffered by Joseph and Francis Coveney when the Government called two of their former attorneys to testify, one invoking the attorney-client privilege 20 times. Each of the

Coveneys was convicted of aiding and assisting in the preparation of 29 false income tax returns, and conspiracy to commit those offenses.  Finding the evidence on conspiracy and 16 of the aiding and assisting counts sufficient, and no reversible error arising out of the attorneys' testimony, we **AFFIRM** on those counts. However, because the evidence, as contained in the incomplete record on appeal, is insufficient for 13 of the aiding and assisting counts, we **REVERSE** those convictions, and **REMAND** for resentencing.

## I.

In 1983, brothers Francis and Joseph Coveney formed Temperature Technology, Inc. (TTI), a Houston-based company which installed energy management systems (EMS) in commercial buildings. (An EMS is an energy control unit which is connected to an item of equipment and is designed to reduce energy use by causing the item to cycle on and off.)  TTI became a recommended installation company for the OEC Leasing Corporation (OEC), as part of its promotion of a tax shelter program.  OEC purchased EMS units from Franklin New Energy Corporation (FNEC).  (The EMS was driven by a microprocessing panel manufactured by Eckard Engineering.)  OEC leased the EMS units to investors, who in turn contracted with an installation company to install and service the systems.  The installation company was responsible for locating an "end-user" for each system -- a commercial building where the unit would be installed.  If the EMS saved energy costs, those savings would be shared by the end-user, the investor, and the installation

2

company.[1]  In addition to these shared savings, the installation company received an installation fee from the investor, the end-user reaped the benefits from a unit it was not required to purchase or maintain, and the investor was entitled on his income tax return to an investment tax credit and deductions for, among other things, depreciation and installation.

Almost immediately, TTI began to experience technical problems with the OEC units, which were apparently caused by the FNEC/Eckard microprocessors.  TTI attempted to correct the problem, and, in May, hired John Millar as national service manager.  Millar's technical staff made a number of changes in the microprocessing chips and eventually resolved the problem.

At approximately the same time, Francis Coveney directed Millar to begin developing a solar-powered EMS. Millar immediately developed a prototype using the FNEC/Eckard unit.  Also working with a National Enco brand EMS, which he considered superior, he converted the National Enco eight and 16-channel units to solar power, but was unable to do so with the 24-channel unit.[2] This 24-channel unit had a remote monitoring capability, which allowed the

---

[1]    The end-user retained 50% of the savings.  It was billed by the installation company for the other 50%.  The testimony was inconsistent on the further division of the savings.  Some witnesses testified that the installation company kept 15% of the savings and forwarded the remaining 35% to the investor; others, that the installation company kept only 15% of the amount it received from the end-user, leaving 85% of that amount for the investor.

[2]    Each channel represents an individual switching device which will control one piece of equipment.  An eight-channel unit, for example, can control eight different pieces of equipment within a building.

3

unit to be accessed and programmed through telephone lines. Without such remote monitoring, the unit must be serviced on site. Although the eight and 16-channel National Enco units did not have remote monitoring, the FNEC/Eckard units did. But, Millar was never able to convert those units to solar power while maintaining the remote monitoring feature.

Francis Coveney had directed development of a solar-powered EMS with an eye toward a new venture. In August 1984, he formed Enersolex, a San Antonio-based company which marketed a tax shelter similar to that offered by OEC. In the Enersolex program, however, investors purchased, rather than leased, their EMS units, and the units were to be solar, rather than electrically, powered. There was no added benefit for the installation company or the end-user; but, because the unit was solar powered, the investor was entitled to a 15% energy tax credit, in addition to the investment tax credit and deductions available to an OEC investor.

While Millar was still developing the prototypes, financial planners expressed an interest in marketing the solar-powered EMS. TTI retained Raymond Merry, an energy consultant, to analyze the feasibility of such a system.[3] He prepared a report on the capabilities of the proposed EMS, but noted carefully that it had not yet been assembled. And, Enersolex retained Craig Welscher, an attorney, to prepare a tax opinion on the proposed solar unit.

---

[3] Merry testified that he wasn't sure who intended to use his report. He was retained by TTI and conducted the evaluation at its offices, but he understood that the device was being manufactured by Enersolex.

4

Moreover, Francis Coveney retained CPA John Pearl to prepare an analysis of the estimated tax write-off and cash benefits of the Enersolex system. The documents became part of the Enersolex promotional package, which was distributed to financial planners. A videotape featuring the National Enco prototype was prepared, as well as a slideshow featuring the FNEC/Eckard model. Representatives of both Enersolex and TTI visited a number of cities, promoting and demonstrating the solar-powered EMS. TTI, still installing and servicing OEC units, was also a recommended installation company for the new Enersolex program.

Meanwhile, a New Jersey-based Internal Revenue Service task force, investigating potentially abusive tax shelters, had heard of the Enersolex promotion. In October 1984, two IRS agents travelled to San Antonio and met with Francis Coveney, his attorney, accountant, and the Enersolex marketing director. Francis Coveney demonstrated the Enersolex unit and asked whether he should continue to sell it. The agents explained that they were not then in a position to answer that question, but would advise him if they determined that the tax shelter was abusive. The investigation was transferred to Texas before that determination was made.

By the end of 1984, approximately 115 Enersolex units had been sold, most in the last two weeks of December.[4] A majority of the Enersolex investors selected TTI as their installation company. Each investor received a letter from Joseph Coveney, thanking them

---

[4] Testimony regarding the purchase price ranged from $32,500 to $52,000.

for selecting TTI and telling them that information about their end-user location would be forthcoming. A second letter told them when and where their unit had been installed; most included photographs of the unit and/or the end-user site.

Although TTI had represented that it had secured numerous end-user locations for the Enersolex units, this was apparently not the case. Because most investors intended to file their income tax returns on April 15, *see infra* at 7 and note 20, the pressure was on to install these units in the first few months of 1985. By letter in February 1985, TTI informed OEC investors for whom it was an installer that it would no longer service units through the OEC program, explaining that it was becoming increasingly difficult to obtain parts for repair and maintenance of those units. Therefore, the units would be removed, and each OEC investor was to inform TTI where his unit should be sent. Within days of that notice to OEC investors, Enersolex investors began to receive letters from TTI about their end-user sites. Many of the Enersolex units were installed in the same locations from which OEC units had been removed. There was extensive testimony at trial regarding specific locations. In some cases, the OEC unit was physically removed, and an Enersolex unit installed in its place. In most cases, however, the OEC unit was simply converted to solar power.[5] Among other

---

[5] TTI was responsible for locating end-users, and Joseph Coveney testified that he believed the locations belonged to TTI. Not so for the units installed there. The service agreement between TTI and the OEC lessees stated that "[t]he lessee shall retain full legal possession of the system notwithstanding delivery of the service company". Indeed, Joseph Coveney admitted that the "EMS unit on the wall ... was the OEC lessee['s]. That was his."

things, internal wiring was changed, and the unit was connected to solar panels which were installed on the roof. The brown OEC units were painted blue and an Enersolex sticker added. Each Enersolex investor was notified of his unit's installation; and, on their 1984 tax returns, most claimed a 15% energy tax credit, a 10% investment tax credit, and deductions for depreciation and installation (tax benefits).

Picking up on the earlier investigation, IRS agents in Texas met with representatives of Enersolex, including Francis and Joseph Coveney, on April 3 and 22, 1985. That July, they referred the case to the Criminal Investigation Division of the IRS. First indicted in April 1991, Francis and Joseph Coveney, Enersolex accountant John Pearl, and Gerald Ramsey, TTI's vice-president of operations, were charged in a superseding indictment in October 1991 with conspiracy to aid and assist in the preparation of false income tax returns (count 1). Pearl and the Coveneys were also charged in 30 counts with aiding and assisting in the preparation of false income tax returns (counts 2-31). And, Ramsey was charged in two additional substantive counts (counts 32 and 33).

In presenting its evidence, the Government called two of the defendants' former attorneys as witnesses, as discussed in part II.A. The defendants unsuccessfully moved for a mistrial, premised on the repeated invocation of the attorney-client privilege. Their motions for judgments of acquittal upon the completion of the Government's case-in-chief were taken under advisement, re-urged at the close of all the evidence, and ultimately denied.

Before the case went to the jury, the Government dismissed one substantive count against the Coveneys and Pearl (count 4). Francis and Joseph Coveney were each found guilty on the conspiracy count and the remaining 29 substantive counts against them; Pearl was acquitted; and Ramsey was found guilty of conspiracy, but acquitted on his two substantive counts. On the conspiracy count, Francis Coveney was fined $3,500 and Joseph Coveney, $2,750; and each was sentenced to 30 concurrent prison terms -- Francis Coveney's being 18 months each, and Joseph Coveney's, 16 months each. Only the Coveneys are before us on appeal.

## II.

The Coveneys challenge the denial of a mistrial and the sufficiency of the evidence.[6]

## A.

The grant or denial of a mistrial is, of course, a matter left to the discretion of the district court. We review only for abuse of that discretion, **United States v. Burke**, 496 F.2d 373 (5th Cir.), *cert. denied*, 419 U.S. 966 (1974), and, as explained below, find none here.

After the Government subpoenaed three of the defendants' former attorneys to testify, the defendants moved to quash, asserting the attorney-client privilege. The district court denied the motions, but conducted a voir dire of the witnesses to

---

[6]    Francis and Joseph Coveney filed virtually identical briefs. Therefore, we analyze their cases individually only when considering the sufficiency of the evidence against them.

8

establish the acceptable boundaries for their testimony.  Two of the three, Robert Fee and Craig Welscher, were called to testify.

Fee was called as the Government's first witness.  After he twice invoked the attorney-client privilege, the defendants moved for a mistrial.  The motion was denied, but the jury was given a limiting instruction.[7]  When Fee invoked the privilege a third time, the defendants unsuccessfully re-urged their motion.

After a three-day weekend, the trial resumed; and Welscher was called as the third witness that day.  During his testimony, the

---

[7]     The district court instructed the jury as follows:

> You have heard this attorney do what is called invoking a privilege, an attorney-client privilege in terms of him not testifying about things that he may have been told or discussed or saw or heard or observed having to do with his representation of one or more of the defendants in this case.  Please understand that that is a completely acceptable practice in the law.  Any time anyone goes to an attorney to discuss anything, no matter how frivolous, they are entitled to assume that that is going to be held in confidence, and any attorney who receives such information may not divulge it to third persons even in open court without the express permission of his client.  There is nothing sinister nor inappropriate nor illegal nor evil about invoking the attorney-client privilege.  It is simply, simply put from our childhood, "I told you a secret and I expect you to keep it," nothing more than that.
>
> Please, do not engage in any speculation or conjecture as to what communications, if any, might have transpired.  Do not engage in any imagination as to what questions or answers might have flown from any answer but the one that counsel gave in regard to that specific question.

attorney-client privilege was invoked 20 times, either by him or one of the defendants.[8]

The Coveneys contend that the Government knew Fee and Welscher would assert the attorney-client privilege, and committed reversible error by calling them to testify. They maintain that continued invocation of the privilege, highlighted by the district court's "ineffective" limiting instructions,[9] cast suspicion on them and caused the jury to believe that they were "keeping secrets".

---

[8] When the Government asked Welscher what materials he relied on in preparing his tax opinion, the defense objected, and the court gave the following instruction to Welscher and the jury:

> [W]hen you answer this question, I want you to feel free to refer to any treatises, law, or other generally recognized publications that you would of necessity rely on in formulating any such opinion. They are clearly within the public domain and don't refer to these defendants. To the extent that they gave you any documentation, information, representation, or other information that you relied on to formulate the report that indeed you incorporated into the report which was subsequently published, you may, of course, reveal all of that as well and of necessity must.
>
> Anything that was revealed to you that is not made a part of the report clearly falls within the attorney-client privilege, and I do not want that waived inadvertently. So I'm asking you to give a complete answer based on the limitations I have expressed.
>
> Ladies and gentlemen, by admonishing this witness along those lines, please understand that I am not suggesting to you that there is any secret information out there or anything along those lines. I am simply requiring this lawyer to do that which he must, which is to observe the attorney-client privilege, and that's all.

[9] See notes 7 and 8, *supra*.

Both the Supreme Court, *see* **Namet v. United States**, 373 U.S. 179 (1963), and our court, *see* **San Fratello v. United States**, 340 F.2d 560 (5th Cir. 1965), have recognized that forced invocation of a testimonial privilege might, in some cases, so prejudice the defendant as to warrant reversal. Having reviewed the testimony of both attorneys, we are convinced that this is not such a case.

In **San Fratello**, this court found reversible error where the Government called the defendant's wife to testify after she had made it known to the court that she would refuse on the ground that her testimony might incriminate her. When called, she answered questions about her name and address, but, invoking the privilege, refused to answer further. The district court instructed the jury that "[t]he reluctance of a witness to incriminate herself may not be used to incriminate others", **San Fratello**, 340 F.2d at 563-64, and emphasized that no unfavorable inferences could be drawn against the defendant because of his wife's refusal to testify. This court concluded, however, that "[t]he prosecution could have had no purpose in calling this witness and requiring her to claim her privilege in the presence of the jury other than to use her conduct as an incriminating circumstance against her husband". 340 F.2d at 567. Even the limiting instruction did not cure the error, because it was "more than reasonably probable" that the wife's refusal to testify prejudiced her husband. *Id*.

The case before us, however, is much more closely analogous to **Namet**. Unlike the wife who refused to testify in **San Fratello**, Fee and Welscher "possessed nonprivileged information that could be

11

used to corroborate the Government's case".  *Namet*, 373 U.S. at 188.  Fee's testimony was very brief.  He testified that he had been retained by TTI in early 1984, but refused to elaborate.[10] Both of the questions he refused to answer[11] were quite similar to questions he had answered at voir dire.[12]  They did not touch on sensitive areas or critical issues in the case.  His testimony was of no particular import to the Government's case; but, on the other hand, his refusal to answer could not have raised any suspicion that he was "keeping a secret" for the Coveneys.

Conversely, Welscher was an important substantive witness.  As author of the tax opinion used in the Enersolex promotion, his testimony was critical to the Government's case.  Although he claimed the privilege 20 times, this number must be viewed in the context of his entire testimony and the substance of the questions.  First, his testimony was significantly longer than that of any other witness in the 12-day trial.  As in *Namet*, "[t]he effect of these questions was minimized by [Welscher's] lengthy nonprivileged testimony".  373 U.S. at 189.  Second, the privilege was often

---

[10]   The Coveneys contend that Fee was called only to establish that they refused to follow his legal advice.  At his voir dire, the Government did explain that it wished to call him for that purpose.  The court made it clear, however, that such testimony would not be allowed; and the Government did not inquire about the substance of his legal advice.

[11]   As noted, Fee invoked the attorney-client privilege three times, but twice it was in response to the same question.

[12]   For example, at voir dire, Fee was asked, "You were hired ... in 1984 to syndicate a tax opinion, weren't you?", to which he answered "Yes".  When asked if he was hired because he was a tax specialist, he asserted the privilege.

12

asserted in response to questions which were not even slightly incriminating, and which were ultimately answered by other witnesses.[13] Some of the questions were inappropriate and intruded into privileged territory; but "[w]e cannot find that these few lapses, when viewed in the context of the entire trial, amounted to planned or deliberate attempts by the Government to make capital out of witnesses' refusals to testify." *Namet*, 373 U.S. at 189.

Moreover, any error was cured by the district court's limiting instructions. Although the instructions made reference to secrets, they also made it clear that a lawyer is duty-bound to invoke the privilege, and that its invocation should not be perceived as an effort to hide information from the jury.

### B.

The Coveneys also contend that the evidence was insufficient to convict them for aiding and assisting in the preparation of false income tax returns, and conspiracy to do so.[14] We view the evidence

---

[13] Welscher asserted the privilege in response to questions about, *inter alia*, the nature of TTI's business, what TTI did before it began to install EMS units, and whether anyone had explained to him how an EMS worked.

[14] The record on appeal reflects numerous acts by the Coveneys that are shabby business practices at best; criminal violations at worst. For example, the Enersolex promotional brochure touted the creation of a defense fund, through which Craig Welscher was to serve as counsel to any investor whose claims were challenged by the IRS. Welscher testified that no such fund existed. As another example, when IRS agents were scheduled to visit the Enersolex offices in San Antonio in October 1984 to see the solar-powered units, the Enersolex warehouse was empty. Therefore, approximately 200 boxes, for OEC units, were moved from TTI's Houston warehouse, and "Enersolex" was stenciled on them. Steve Halliburton testified that most of the boxes were empty -- only about ten contained OEC EMS units.

supporting criminal convictions in the light most favorable to the verdict, and affirm if "any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt". *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992).

Of course, when multiple defendants are tried on a multi-count indictment, as here, the analysis is a lengthy one. We must review each count separately as to each defendant. Our review in this case, however, is atypical. Neither the evidence at trial, nor the briefs on appeal, have been presented in such a fashion. Rather, the Government's theory has been a global one: Enersolex marketed a solar-powered energy management system and promoted its potential tax benefits; Enersolex never created the system it marketed; therefore, investor/taxpayers who claimed the tax benefits which the defendants represented they were entitled to, filed returns which were, by definition, false; and, because the defendants knew that the investor/taxpayers were not entitled to those tax benefits, they aided and assisted in the preparation of the investors' false returns. Under such a theory, the Government need only prove that the investors filed tax returns claiming tax benefits for a system which did not exist, and that the defendants assisted them in doing so. Having reviewed the record on appeal, however, we must conclude, for the reasons that follow, that a reasonable jury could not have found these defendants guilty beyond

Notwithstanding the repugnance of such activities, it must be kept in mind that the only charges before us are aiding and assisting in the preparation of false income tax returns, and conspiracy to do so. That is what the Government was required to prove beyond a reasonable doubt.

14

a reasonable doubt on the global theory asserted by the Government.

In addition to the difficulty of trying to piece the evidence together on a count-by-count basis, our task in analyzing its sufficiency is complicated greatly by the incomplete state of the record on appeal. After trial, hundreds of exhibits were released to the Government "for safekeeping until the time for appeal has run". After the Coveneys filed their notices of appeal, each ordered transcripts of his initial appearance, arraignment, trial and sentencing. They made no further designation of the record. In short, they did not request inclusion of the exhibits. Nor did the Government supplement the record. Therefore, the record before us consists only of the papers filed in the district court and the transcripts ordered by the appellants. We do not have the exhibits.

It is well-settled, of course, that the appellant bears the burden of creating the record on appeal. Fed. R. App. P. 11(a). If the record does not establish a basis for reversal, we will affirm. Here, however, the record provided by the appellants, albeit incomplete, shows that the evidence was insufficient to support the Government's global theory. We must then look to more specific evidence for whether each tax return listed in the indictment was false, and whether the defendants willfully assisted in its preparation. In some instances, those elements can be established from the trial testimony. In others, they cannot. It may well be that the documentary evidence, to which we are not privy, would establish the essential elements on those counts. The

15

dilemma before us, then, is which party bears the burden of placing such evidence into the appellate record.  If the burden is with the appellants, we must affirm as to those counts.  *See **United States v. O'Brien***, 898 F.2d 983, 985 (5th Cir. 1990).  But, if the burden is with the Government, we must reverse the convictions as to the applicable counts.

We hold that, *given the specific facts of this case*, the burden of establishing a record which might provide sufficient evidence of an alternative basis for affirmance must be with the Government.  Though the appellants must initially designate the record, the appellee always has the opportunity to supplement it.  Here, the appellants needed only the record, as they ordered it, to show that there was insufficient evidence to support the Government's global theory.[15]  Thus, we must consider the alternative basis for affirmance through a count-by-count review; and the Government must bear responsibility for providing us adequate information with which to do so.

Moreover, the Government must realize that the potentially critical documents are not in the record before us.  They were released to it at the close of the trial, and there are repeated references to them in the Government's brief.  There are no such

---

[15]  The record does contain the trial exhibit list.  While we recognize the generality of that list, it appears that the documentary evidence would not have provided the necessary additional support to prove, beyond a reasonable doubt, the Government's contention that no solar-powered EMS unit ever existed.

16

references in the appellants' briefs.  From this, we must conclude that the exhibits are still in the Government's possession.

We have recognized, in the civil context, that the appellee bears some responsibility for creating a complete record on appeal. *See* **Soley v. Star & Herald Co.**, 390 F.2d 364 (5th Cir. 1968). **Soley** was decided before the Federal Rules of Appellate Procedure became effective, so it relies upon rules of civil procedure which have since been usurped by the appellate rules.  However, the rationale behind that decision is unchanged.  There, the district court dismissed an action for failure to state a claim.  In so doing, it apparently referred to evidence outside the pleadings. Acknowledging that the motion had been treated as one for summary judgment, our court concluded that it was unable to review that judgment, because the record did not include the evidence to which the district court had referred.  The appellees asserted that they were entitled to affirmance by default:  because the record did not include the necessary information, there were no grounds upon which to reverse.  Our court disagreed, concluding that the appellees had notice of the appellant's allegation of error, and were "not devoid of responsibility to inform" the appellate court.  **Soley**, 390 F.2d at 367.  "That responsibility increases when such appellees seek our stamp of approval on an unarticulated summary judgment for which no justification can be found in the record." **Id**. at 368.

Likewise, that responsibility must also increase when we are asked by the Government to conclude, pursuant to its global theory, that the jury had sufficient evidence upon which to convict.  If

17

the Government has nonetheless proven guilt beyond a reasonable doubt on some other theory, it bears the burden of showing us how. Obviously, this includes providing a sufficient and complete record on appeal.

1.

We look first to the 29 substantive counts of aiding and assisting in the preparation of false income tax returns, in violation of 26 U.S.C. § 7206(2).[16] Proof for such a violation must establish that (1) the defendant advised or assisted in the preparation of a tax return, (2) the return was false or fraudulent as to a material matter, and (3) the defendant acted willfully in doing so. *See **United States v. Salerno***, 902 F.2d 1429 (9th Cir.

---

[16]   The statute reads, in pertinent part:

Any person who --

\* \* \*

> (2)  **Aid or assistance.**--Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document ...

\* \* \*

shall be guilty of a felony....

26 U.S.C. § 7206.

18

1990); **United States v. Sassak**, 881 F.2d 276 (6th Cir. 1989); **United States v. Hooks**, 848 F.2d 785 (7th Cir. 1988).

The evidence was sufficient to show that Francis and Joseph Coveney advised or assisted in the preparation of the tax returns of all Enersolex investors. A person need not actually sign or prepare a tax return to aid in its preparation. *See* **United States v. Williams**, 809 F.2d 1072 (5th Cir.), *as corrected*, 828 F.2d 1 (5th Cir.), *cert. denied*, 484 U.S. 896 (1987). It is sufficient that the Coveneys knowingly participated in the sale and installation of EMS units and provided information about the transaction "*with the expectation*", **id**. at 1095 (emphasis in original), that the investors would use that information to file their tax returns.

The Coveneys hired Ray Merry to prepare a report on the technical feasibility of the solar-powered EMS. They retained Craig Welscher to prepare an opinion letter on the tax implications of purchasing the system and John Pearl to prepare an analysis of the estimated tax write-off. They included all three documents in a promotional brochure which was provided to potential investors and financial advisors. The jury could have concluded that the Enersolex project was marketed through financial advisors because the Coveneys knew that its tax advantages were among its strongest selling points. Finally, Joseph Coveney provided each Enersolex investor who chose TTI as its installation company with photographs of their unit and information about the date of installation. In short, the jury could reasonably have found that the Coveneys

marketed the units and provided the tax opinions and installation dates *with the expectation* that investors would rely on that material in filing their income tax returns.

The more difficult question is whether the evidence was sufficient as to the Coveneys willfully providing information which they knew would lead to the preparation of tax returns which were false as to a material matter. If they had told investors that they had purchased a solar-powered EMS and that the EMS had been installed, when, in fact, no solar-powered EMS existed, then certainly the elements of willfulness and falsity would also be established. As noted, however, the record does not support that global theory.

The Government put on extensive evidence that Enersolex often demonstrated a National Enco prototype, but actually sold a modified FNEC/Eckard unit; that there were problems with the FNEC/Eckard microprocessing chips; that Millar considered the National Enco model a superior one; and that the Enersolex EMS could not simultaneously operate on solar power and retain its remote monitoring capability. However, none of these facts, or even all of them considered together, could lead a reasonable trier of fact to conclude that no solar-powered EMS was ever developed. In fact, many of the Government's own witnesses testified to the contrary.

Welscher testified that he saw the Enersolex unit work at least twice. Welscher was unsure whether the units he saw were developed from National Enco or FNEC/Eckard models, but Millar

20

testified that he was able almost immediately to convert the FNEC/Eckard EMS unit to solar power.[17]  Jack Teschemacher, the Enersolex marketing director, testified that changes were made in the FNEC/Eckard units to "bring them up to the Enersolex standards".[18]  Michael Munroe, whose company sold solar panels for use with the Enersolex units, testified that solar power seemed an expensive way to operate the EMS, but solar panels were capable of powering the unit.  Kent Maerki, head of Spectra Financial Network, through which numerous Enersolex units were sold, and one of his sales representatives also testified that they witnessed

---

[17]  Millar did testify that the unit could not simultaneously operate on solar power and retain remote monitoring capability. Units which were not solar powered, of course, could not qualify for the energy credit.  But, there was no evidence, nor was the jury instructed, that a unit must have remote monitoring ability in order to qualify for an investment tax credit or energy credit. Certainly, TTI would prefer to access its units by telephone in order to avoid on-site maintenance calls.

From this obvious preference, the Government builds its argument that technicians were instructed to disable the solar power in order to maintain the remote monitoring.  But, while there is evidence that, on one occasion, Francis Coveney instructed technicians to install solar panels on the roof but not connect them to the EMS unit, there is no evidence that this was standard procedure.  It may well be that any tax returns filed in relation to that transaction were false, and that the Coveneys aided and assisted in their preparation.  Obviously, such evidence is insufficient to establish that all tax returns claiming Enersolex-related deductions and credits are false.  This is particularly so in light of the testimony that, in many cases, solar panels were installed *and connected to* the EMS unit.

[18]  Teschemacher also testified that at least two of the National Enco prototypes were installed at Enersolex end-user locations. There was no evidence to the contrary.  Even if the FNEC/Eckard unit never worked with solar power, installation of solar-powered National Enco models (which the Government seems to concede would qualify for the claimed credits and deductions) would militate against the global conclusion that all Enersolex investors filed false tax returns.

demonstrations of the Enersolex units, which appeared to be functioning properly.

Defense witnesses also testified that the Enersolex units worked. John Pearl testified that he witnessed demonstrations of both the National Enco and FNEC/Eckard prototypes. George Reneer, an end-user whose EMS was either replaced with a solar-powered unit, or converted to solar power, as discussed *infra* concerning count 3, testified that he saved money as a result of the unit installed at his business, and that he continued to do so with a solar-powered unit.

The Government emphasizes that many witnesses testified that they simply couldn't tell whether the EMS unit was working, or whether it was being powered by solar panels. Indeed, they did; but obviously, much more is required for a guilty verdict. The Government must prove guilt beyond a reasonable doubt. In sum, testimony which merely calls the investment (and, as a result, its tax advantages) into question, is not sufficient, standing alone, to support a conviction. Therefore, we must look to each substantive count of the indictment and determine whether either of the Coveneys aided and assisted in the preparation of the tax return claimed to be false. In 16 instances, **counts 6-8, 12, 13, 15, and 22-31**, we conclude that they did.

**Count 6.** Douglas Devore purchased an eight-channel Enersolex EMS. He selected TTI to install it, and received notice that his unit, serial number 8437, had been installed at the Ione Top Value

22

Market in Ione, California,[19] on April 23, 1985.[20]  Devore testified

that he spoke with an employee at the Ione Top Value and asked him

to check the serial number on the EMS unit installed there.  Though

Devore never testified to the number the employee read to him, he

said that he became "concerned because of information [he] had

now".  A photograph taken of the unit at the Ione Top Value

reflected a serial number which did not match the one assigned to

Devore.  Devore received a subsequent letter from TTI informing him

that the unit had been removed from Ione and installed at the Del

Sol Food Market in Houston, Texas.  But, a photograph of the unit

at the Del Sol revealed that it was a 16-channel unit, not an

eight-channel, as Devore had purchased.

Devore testified that he filed a 1984 return in which he

claimed benefits as a result of the Enersolex investment.  Given

all of this evidence, a reasonable jury could have concluded that

Devore never owned a unit entitling him to those benefits.

Likewise, because Enersolex (Francis Coveney) and TTI (Joseph

---

[19]    Devore testified he was told initially that his unit would be installed in Newport Beach, California.  This was apparently near his home, and he told TTI representatives that he intended to see the unit.  Approximately a month later, he was informed that the unit could not be installed in Newport Beach and would, instead, be installed in Ione.

[20]    All of the returns at issue were for the 1984 tax year.  We do not determine when the units must have been installed to qualify for 1984 tax benefits, however, because TTI notified the investors of the installation dates (only one of which was in 1984) and there are no allegations that those dates were fabricated.  The Government does not contend that the investors' decisions regarding the year for which they would claim the benefits of their investments were the result of any aid or assistance from the Coveneys.

Coveney) gave him information apparently confirming such ownership, a reasonable jury could have also found that the Coveneys aided and assisted in the preparation of the false tax return filed as a result of those representations.

**Counts 7 and 8.** Guillermo Bruce purchased an Enersolex EMS on the recommendation of his financial planner, and was subsequently informed that his unit, serial number 8434, had been installed at the Lamplighter Restaurant in North Hollywood, California, on December 31, 1984. Millar testified that the installation at the Lamplighter was not a conversion. He took an Enersolex unit to California, but did not activate its solar capacity. Francis Coveney had instructed him to install the solar panels, but not connect them to the unit, in order to maintain the remote monitoring capability. In short, this unit looked solar powered, but wasn't.

Approximately six weeks after receiving notice of the December installation, Bruce was informed that his unit had been removed from the Lamplighter because "savings could not be maintained at the end user location due to the operation of the owner". Two weeks later, he was advised by letter that his unit had been installed on June 10, 1985, at the Ione Top Value Supermarket.

Bruce claimed 1984 tax benefits for his Enersolex investment both personally and through Bruce Investments Company. Other evidence at trial included a photograph taken in 1986 of the EMS unit at the Ione Top Value. That unit bore a different serial number: 8467. A reasonable jury could have concluded that Bruce

24

never owned the Enersolex unit for which he claimed those benefits. Accordingly, the returns for Bruce and his company would be false as to a material matter. As in the case of Devore, a reasonable jury could have found that the Coveneys aided and assisted in the preparation of those returns by giving false information upon which a taxpayer relied in filing a return.

**Counts 12 and 13.** Janet Horner and her husband also purchased the smallest Enersolex unit, an eight-channel EMS. She testified that, as a result of that purchase, they claimed benefits on their 1984 personal and JMH Investment Company returns. A letter dated May 1, 1985, informed the Horners that their unit had been installed at Longhorn Foods.

Richard Barsness, an OEC investor, testified that one of his units, leased in 1983, was installed at Longhorn Foods. Joseph Coveney confirmed that a 24-channel unit was installed for Barsness at that location. Some time later, however, Barsness received notice that his unit was being removed from that location because TTI was "unable to obtain necessary repair parts from the manufacturer and because of economic reasons".[21]

Janet Horner testified that she understood the Longhorn Foods location was being "transferred" to her. She, however, purchased an eight-channel EMS. The unit installed for Barsness had 24 channels. Joseph Coveney testified that that same unit "is on the wall now assigned to Janet Horner". Because Barsness testified

---

[21] Joseph Coveney testified that these letters were sent to OEC investors in February 1985.

25

that he did not transfer his unit to anyone and gave no one permission to use it, a reasonable jury could have concluded that Enersolex "sold" the Horners a unit which belonged to OEC and was being leased to Barsness.  The Horners could not, therefore, own the unit and would not be entitled to the tax advantages for such ownership.

**Counts 15 and 22 through 31.**  Count 22 involves the return of the Energymisers partnership; counts 15 and 23-31, returns filed by Energymisers partners.  The partnership invested in several eight-channel Enersolex units and received notice that one of them was installed at Ryder Truck Rental in Houston.

Steve Halliburton, who performed installation work for TTI, described the process of converting an electrically-powered FNEC/Eckard EMS to solar power.  He testified that he performed this transformation at a number of locations, thereby converting an OEC unit to an Enersolex unit.  One location was Ryder Truck Rental.  In light of the testimony about Enersolex's difficulty in locating end-users and the termination of TTI-OEC contracts so that OEC sites could be used for Enersolex investors, a reasonable jury could have concluded that the unit at Ryder Truck Rental was the property of OEC and one of its lessees.  As was the case with the Horners, it could not legally have been sold to Energymisers.

Phillip Rulon, the general partner who prepared 1984 income tax returns for Energymisers partners, testified that Energymisers claimed tax benefits because of the Enersolex investment.  Moreover, those benefits were passed through to the partners and

26

were reflected in their individual returns. Neither the partnership nor the partners would be entitled to such benefits if the EMS was not Enersolex's to sell.

Evidence regarding **counts 2, 3, 5, 9-11, 14, and 16-21** was admitted at trial. However, the testimony was insufficient to prove that the tax returns were false, or that the Coveneys willfully provided the false information rendering them so. Accordingly, as hereinafter discussed, there was insufficient evidence from which a reasonable jury could find, beyond a reasonable doubt, that either Francis or Joseph Coveney was guilty on these counts.

**Count 2.** Rena and Clifford Brantner claimed benefits on their 1984 return as a result of purchasing two eight-channel Enersolex units. They received letters from Joseph Coveney informing them that one unit was installed on April 8, 1985, at Patterson Services in Houston; the other, at Baytown Motors in Baytown, Texas, on April 11, 1985. The IRS disallowed the Brantners' depreciation deduction, and they appealed. Clifford Brantner testified that they "did resolve [the matter]" through the appeal process. It is unclear from his testimony whether other credits or deductions were disallowed, and how the depreciation issue was finally resolved.

This evidence is insufficient to establish either the falsity of the return or the Coveneys' willfulness. We cannot discern the precise basis for the IRS's initial disallowance, or how that matter was ultimately concluded. Neither are there any questions raised, as there were on some counts, about the Brantners'

27

ownership of their units, or whether those units were actually solar powered. And, the record on appeal is silent about either of the Brantners' end-user locations.

**Count 3.** Concerning Katheryne and Roger Chassay's return, he testified that he invested in Enersolex for the 1984 tax year, and claimed benefits as a result of that investment. Chassay testified also that he visited Gayla Industries, the installation site for one of his units, on more than one occasion. During a visit in May 1985, solar panels were visible on the roof; on another occasion, they were not.

Reneer, the vice-president of Gayla, whose testimony is discussed in part *supra*, was called as a defense witness, and testified that TTI installed an EMS there in the early to mid-eighties, that the unit saved money on electric bills, and that solar panels were later added to the system. When Gayla added a new roof to its building, the panels were removed, but Reneer never contacted TTI to replace them. Reneer identified a photograph of the Enersolex unit installed at Gayla, confirming that it looked as if a label underneath the one pictured had been torn off. But, he testified that "either a sticker or a label was changed or *maybe there was a different panel to start with*." (Emphasis added.)

This evidence is similar to that which we found sufficient for counts 15 and 22-31. It is a close call. But, because Reneer testified that the EMS unit may have been replaced, we hold that it is insufficient to establish the Coveneys' guilt. A reasonable jury could not have concluded beyond a reasonable doubt that an OEC

28

unit was initially installed and later converted to solar power. Therefore, there is insufficient evidence to conclude that the Chassays did not own the unit.

A reasonable jury could have concluded that the unit ceased being solar powered when Gayla re-roofed its building. However, there is no proof on when that took place. In order to establish falsity in the Chassays' 1984 tax return, the Government had to prove that the unit was not solar powered during the period covered by that return. Nor, concerning the panel removal, was there any testimony which would establish the Coveneys' willfulness. Indeed, there was no testimony that the Coveneys knew about, or directed, removal of the panels.

In short, this evidence could not have led a reasonable jury to conclude either that the Chassays' 1984 income tax return was false, or that the Coveneys willfully provided information rendering it so.

**Count 5.** For Barbara and Stephen Kucka's 1984 return, Stephen Kucka testified that, on November 16, 1984, he received a letter from Joseph Coveney, informing him that his Enersolex unit had not been installed. On April 8, 1985, he received notice that his unit had been assigned serial number 8410, and installed at Chem Central in Houston on April 1. In reliance on this information, Kucka claimed tax benefits, which were disallowed by the IRS.

Kucka's testimony also described his difficulty in contacting TTI. After numerous attempts to do so, he called Chem Central to confirm installation. He learned that the "unit was not functional

29

and not working". Millar testified that he performed the Enersolex installation at Chem Central. He explained that an OEC unit had previously been placed at that location, but was not converted to solar power. Rather, it was replaced with an Enersolex unit.

This evidence could not lead a reasonable jury to find the Coveneys guilty beyond a reasonable doubt of aiding and assisting in the preparation of a false income tax return. There is no evidence which calls the Kuckas' ownership of the unit into question. Steve Kucka testified that the unit did not work, but this alone does not establish the falsity of the return or willfulness on the part of the Coveneys. The evidence does not describe the problem, nor is there any evidence that the Coveneys knew this unit did not work properly, or that it malfunctioned because of any action by them.

**Count 9.** Concerning the 1984 return for Carol and Stanley Swartz, there was very little testimony about them; and we conclude that the evidence was insufficient to support the conviction of either Francis or Joseph Coveney.

James Baker, a CPA and Spectra representative, testified that he sold an Enersolex unit to the Swartzes, and that the unit was installed on April 1, 1985. Baker also prepared the Swartzes' 1984 return, which included deductions for depreciation and installation of the Enersolex unit, as well as investment and energy tax credits.

Our review of the record reveals no evidence about the Swartzes' end-user location[22] or the installation process for that unit. In short, a reasonable jury could not have concluded that the Swartzes' return was false as to a material matter.

**Count 10.** As for the 1984 return of Ann and George Yount, they purchased three Enersolex units through Baker. He also prepared their 1984 income tax return, claiming the same benefits as he did on behalf of the Swartzes. Again, there is insufficient evidence from which a reasonable jury could conclude that the Younts were not entitled to those benefits. Indeed, what little testimony was offered on the matter seems to support such entitlement.

The Younts were informed that one of their units was installed at a Ben Franklin store in Houston, another at a Baptist church in the Houston area, and the last at Texas Western Beef (no location given). There was no further identification of the church. The testimony regarding Texas Western Beef and Ben Franklin points to the legitimacy -- not falsity -- of the return. Millar testified that OEC units previously existed at both locations, but that he removed them and installed Enersolex units. There was no contrary evidence. We conclude, therefore, that the evidence was insufficient to establish the falsity of the return.

---

[22] Baker did testify that he and the Swartzes once called the end-user and asked maintenance personnel if the unit was installed there. He did not name the end-user; and a hearsay objection was sustained, precluding him from repeating the response to his installation inquiry.

**Counts 11 and 14.**  These counts involve the 1984 returns of Joyce and Roswell Combs (count 11) and Mignon and Eugene Kurtz (count 14).  The Combses and the Kurtzes each purchased a 16-channel Enersolex unit through their accountant and tax preparer, Phillip Rulon.  As discussed, Rulon also arranged the investments in eight-channel Enersolex units for the Energymisers partnership and prepared the 1984 individual tax returns for most of its partners (counts 15 and 22-31).  The same year, he arranged the purchase of three 16-channel units: one for the Combses, one for the Kurtzes, and one for himself.

Rulon served as the general partner in the Energymisers partnership, and invested in the eight-channel units, as well.  However, it is unclear from his testimony whether the Government was trying to prove that the Combses and the Kurtzes were Energymisers partners, and therefore held an interest in the eight-channel units, in addition to ownership of the 16-channel units.  Moreover, when the Government had Rulon identify Energymisers partners, it did not inquire about the Combses or the Kurtzes.  Because the Government did not establish their Energymisers partnership beyond a reasonable doubt, we cannot affirm the convictions on these counts on the same basis as those involving proven Energymisers partners.[23]

---

[23]   Of course, we mean only that this was not established in the record on appeal (testimony).  Examination of the Combses' and Kurtzes' 1984 returns, had they been included in the record on appeal, would have shown whether they claimed benefits through the partnership.  In addition, examination of Rulon by the Government included repeated references to, and introduction of, exhibits, such as the partnership return and the Schedule K1 and tax returns

32

Furthermore, there is no testimony about the installation or end-user sites for the 16-channel units these taxpayers purchased. Therefore, the record on appeal contains no evidence which could lead a reasonable jury to conclude that the returns were false, or that any crime was committed by the Coveneys in aiding and assisting in their preparation.

**Count 16.** Patricia and Kip Walker purchased an Enersolex unit, and claimed benefits in their 1984 return as a result. Kip Walker testified that he received a letter from TTI stating that his unit had been installed in Austin, Texas, at a business known as Freshco, on June 3, 1985. His testimony was preceded by that of Mike Davis, an OEC investor. Davis testified that he invested in OEC in late 1983, and that his OEC unit had also been assigned the Freshco location. However, he received a letter from TTI, dated June 10, 1985, stating that his unit had been removed because savings could not be maintained. Davis did not sell his unit or give anyone permission to move it.

In light of the testimony about on-site conversions, one explanation of this situation might well be that Enersolex converted a unit it did not own. Absent testimony which would support that theory, however, the jury is not allowed to make such a logical leap, for it is just as likely that the OEC unit was indeed removed and replaced with the Enersolex unit. The record is

he prepared for the partners; but, as stated, none are included in the record on appeal. Our difficulty in reviewing his testimony, without the exhibits referred to during it, is a classic example of why the Government should have included them in the record on appeal.

full of testimony about particular locations, and the installations or conversions which occurred there. However, there is no testimony about the procedure followed at Freshco.

The only other testimony about this location came from Margaret DePrez, with the IRS Criminal Investigation Division. DePrez testified that she visited Freshco in 1987 to photograph the Enersolex unit, but was unable to locate it. The absence of a unit in 1987, without more, does not prove the truth or falsity of the 1984 return. Accordingly, we conclude that the evidence was insufficient to establish the falsity of that return, and therefore, insufficient to support the convictions on this count.

**Counts 17 through 21.** Count 17 involves the 1984 partnership return for Capital Equipment II; counts 18-21, the returns filed by its partners. Galyd Perkins testified that he prepared the 1984 partnership and partner returns. The partnership claimed deductions for depreciation and installation of Enersolex units, as well as investment and energy tax credits. Each of the four partners in issue claimed the tax benefits which were passed through from the partnership.

Testimony revealed that the partnership purchased at least three Enersolex units. One was installed at Truk Shak (no location given); the other two in Houston, at Bobby's Supermarket and North Freeway Porsche-Audi. A TTI field service technician testified that the Truk Shak unit was converted at the warehouse and transported to the installation site. An IRS agent visited the North Freeway Porsche-Audi location in 1987 and photographed the

34

EMS unit installed there.  This evidence could not lead a reasonable jury to conclude that the partners and partnership were not entitled to the claimed tax benefits.  The record on appeal contains no more testimony about these locations or the installations which occurred there.  Accordingly, we conclude that the evidence was insufficient to support the convictions on these counts.

2.

Although the record on appeal contains insufficient evidence for affirmance on all substantive counts, it includes ample evidence that Francis and Joseph Coveney conspired to aid and assist in the preparation of false returns (count 1).  In order to convict for conspiracy under 18 U.S.C. § 371, the jury must find (1) an agreement between two or more people to violate the law, and (2) an overt act by any member of the conspiracy in furtherance of it.  *United States v. Bourgeois*, 950 F.2d 980, 983 (5th Cir. 1992).  Proof of a specific agreement is not necessary; the jury may infer an agreement from a concert of action.  *Id*.

There was substantial evidence that the Coveneys worked together in forming TTI and Enersolex, that they travelled together promoting the Enersolex program, and that they worked together on the day to day operation of each company.  Though Francis worked out of the Enersolex office in San Antonio, and Joseph out of the TTI office in Houston, several witnesses testified that the two companies were essentially one in the same.  Moreover, both brothers were apparently present at meetings where some of  the

35

"conversions" were discussed. An agreement to take an OEC unit, without the consent of the OEC investor, convert it to solar power and "sell" it to an Enersolex investor is an agreement to violate the law, in that, among other things, the sale would aid and assist in the preparation of false returns, because it was performed with the expectation that investors would rely on their erroneous belief of ownership in filing returns.

Needless to say, there were numerous overt acts in furtherance of this agreement. Enersolex units were sold to those investors previously discussed. Joseph Coveney wrote letters to many of them, informing them of the end-user locations and installation dates. There was sufficient evidence for the jury to find that these are all overt acts taken with the expectation that taxpayers would rely on the false information in preparing and filing their returns.

### III.

Accordingly, the convictions on counts 1, 6, 7, 8, 12, 13, 15, and 22-31 are **AFFIRMED**; those on counts 2, 3, 5, 9, 10, 11, 14, and 16-21 are **REVERSED**; all sentences are **VACATED**; and the case is **REMANDED** for resentencing.

**AFFIRMED in Part; REVERSED in Part; and REMANDED.**

36